UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| HECKLER & KOCH, INC.,<br>HECKLER & KOCH GMBH,<br><br>Plaintiffs,<br><br>vs.<br><br>GERMAN SPORT GUNS GMBH,<br>AMERICAN TACTICAL IMPORTS, INC.,<br><br>Defendants.<br>_____<br><br>AMERICAN TACTICAL IMPORTS, INC.,<br>GERMAN SPORT GUNS GMBH,<br><br>Counter Claimants,<br><br>vs.<br><br>HECKLER & KOCH, INC.,<br>HECKLER & KOCH GMBH,<br>G. WAYNE WEBER, and<br>NIELS IHLOFF<br><br>Counter Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | No. 1:11-cv-01108-SEB-TAB |

## <u>ORDER ON PENDING MOTIONS</u>

This cause is before the Court on three motions: (1) Defendants' motion to strike

Plaintiffs' affirmative defenses to counterclaims [Docket No. 282], filed on March 17, 2014; (2)

Plaintiffs' motion for summary judgment [Docket No. 329], filed on July 17, 2014; and (3)

Defendants' motion for summary judgment [Docket No. 331], filed on July 17, 2014. For the

reasons set forth below, Defendants' motion to strike is DENIED as moot, Plaintiffs' motion for

summary judgment is DENIED in part and GRANTED in part, and Defendants' motion for summary judgment is DENIED in its entirety.

**Factual and Procedural Background**

  This matter has been pending on our docket for more than three years, and its antecedent disputes stretch back still further. The array of motions to strike, motions to dismiss, and motions for reconsideration filed by the parties have given us occasion to explore aspects of the case's factual background, but only now do we arrive at the merits of the intellectual property dispute lying at the core of this sprawling body of litigation. While we have summarized the record previously, we endeavor here to outline the undisputed facts, cognizant that the presence of cross-motions for summary judgment will require us to draw varying inferences from them as we address each of those motions in turn.

  Plaintiffs Heckler & Koch, Inc. (HK USA) and Heckler & Koch GmbH (HKG) are firms engaged in the manufacture and sale of firearms—headquartered, respectively, in the United States and Germany.[1] Among products sold under the Heckler & Koch name is the "MP5," a weapon originally designed as a nine millimeter submachine gun by HKG in the 1960s, and which has since become the basis of a "family" of firearms sharing certain core design features; Heckler & Koch first sold the MP5 in the United States in the 1970s. Docket No. 346-5 (Weber Decl.) at ¶¶ 4, 8; Docket No. 333-5 (HKG "Official History") at 247–249, 252–264. In 1990, HK USA registered the MP5 as an international class 13 (firearms) trademark with the United States Patent and Trademark Office ("PTO"). Cooper Decl. ¶ 5. HKG registered the MP5 with the German patent office on June 4, 2008. *Id.* at ¶ 6.

---

[1] As the caption indicates, HK USA and HKG are, together with individual corporate officers G. Wayne Weber and Niels Ihloff, defendants in the counterclaims asserted by GSG and ATI. For the sake of simplicity, however, we will refer to HK USA and HKG collectively throughout this Order, where their individual identities often are not relevant to the discussion.

Defendants are also engaged in the firearms business: German Sports Guns GmbH ("GSG") is an arms manufacturer based in Germany, and American Tactical Imports, Inc. ("ATI") is an arms importer and retailer incorporated and based in New York. Am. Compl. ¶¶ 7–8.[2] Two individuals, both executives for the Plaintiff companies, are also parties to this suit: Counterclaim Defendant G. Wayne Weber is the president of HK USA, Docket No. 251 at ¶ 5; and Counter Defendant Niels Ihloff[3] is a managing director of HKG and consulted HK USA during the 2009 settlement negotiations. *Id.* at ¶ 6.

A number of the claims and counterclaims in this case are premised on differing interpretations of two parallel series of events that unfolded between 2008 and 2010: first, HK USA's initial suit against the Defendants ("the 2009 litigation"); and second, HKG's attempts to obtain a United States trademark registration for the MP5 weapon.

HK USA filed suit in the Southern District of Indiana against GSG, ATI, and a third firearms manufacturer, Orion Arms Corporation, on January 13, 2009 alleging trademark infringement, trade dress infringement, and other related claims. *See* Docket No. 1; *Heckler & Koch, Inc. v. German Sports Guns GmbH, et al,* Cause No. 1:09-cv-00039. The crux of the 2009 litigation was HK USA's claim that GSG, ATI, and Orion were engaged in the manufacture and sale of a weapon—styled the "GSG-5"—that copied the design of the Heckler & Koch MP5. *Id.* At the instigation of the parties' respective executives, the parties engaged in settlement negotiations, and on October 8, 2009 they signed a Settlement Agreement ("the Agreement") that stipulated to the dismissal of the infringement suit. The Agreement's preliminary recitals stated that HK USA owned "a federal trademark registration in the mark 'MP5' (Reg. No.

---

[2] GSG and ATI are both Defendants and Counterclaimants; for simplicity, we refer to them jointly throughout as "Defendants."
[3] Mr. Ihloff's name is misspelled in some of the parties' submissions and captions as "Nils Ilhoff."

1594109)" and that it claimed to own "in the United States a proprietary trade dress comprised of the designs of certain elements of the MP5 firearms (the 'MP5 trade dress')." Docket No. 45-1 at 1. The Agreement also recited that GSG, ATI, and Orion neither admitted that they had infringed HK USA's rights nor conceded that HK USA even had any such rights:

> WHEREAS, GSG, ATI, and Orion have filed in said Lawsuit *Defendants' Answer and Counterclaim* in which they seek a judgment declaring, *inter alia,* that their activities do not infringe, and have not infringed, any intellectual property rights of HK or otherwise violate any law, and that **HK does not own the trademark, trade dress and other intellectual property rights it claims to own.**

*Id.* (emphasis added); *see also id.* at ¶ 9 ("Defendants make no admission of liability for the claims made against them."). As for the substance of the Agreement itself, the defendant parties agreed to pay HK USA $300,000 in exchange for the dismissal of the suit. *Id.* at ¶ 1. They also agreed to halt manufacture of the allegedly infringing GSG-5 design, and to cease selling the weapons once a "sell-off" date had passed. *Id.* at ¶ 2. For its part, HK USA covenanted not to sue GSG or any of its commercial partners in connection with a different weapon design, the "GSG-522" firearm:

> HK has reviewed the design of the GSG-522 attached hereto as Exhibit "A" (the "GSG-522 Firearm") and covenants not to sue GSG or any of its customers, distributors, dealers or importers for its sale in the United States or anywhere in the world, provided GSG otherwise complies with this Agreement. This covenant extends to airsoft guns in the design of the GSG-522 firearm.

*Id.* at ¶ 5.

While the 2009 litigation was pending, ownership of the MP5 registered trademark—together with any accompanying trade dress rights—changed hands between HK USA and HKG. The process began on June 8, 2008, when HKG filed an application for an "international registration under the Madrid Protocol" for the MP5 trademark within the United States, triggering a PTO office action. Cooper Decl. ¶ 7. On September 19 of the same year, the PTO

wrote back to HKG, informing it that had provisionally refused the application for at least two

reasons: first, the MP5 trademark was registered in the name of *HK USA* rather than HKG;

second, an application by an unrelated company for an intent-to-use registration for the similar

mark "MP5A5" was already pending before the PTO, and would need to be resolved before

further action could be taken. *See* Docket No. 332-12 (Defs.' Ex. L); Cooper Decl. ¶ 8. In order

to remove this first obstacle to HKG's registration of the MP5 mark in the United States, HK

USA president G. Wayne Weber executed an assignment agreement ("the Assignment")

transferring to HKG "all right, title and interest in and to the said [MP5] mark, together with the

good will of the business symbolized by the said mark and the respective registration." Docket

No. 251-2 at 5. Weber signed the Assignment on March 19, 2009—some two months after HK

USA had initiated the 2009 litigation, and more than six months before the parties to that

litigation settled it. But despite the pendency of the litigation, neither Weber nor any other

representative of HK USA informed GSG and ATI that the rights upon which the suit was

predicated had been transferred. Docket No. 332 at 20 (citing Defs.' Ex. H).

Meanwhile, HKG continued in its efforts to secure U.S. trademark registration for the

MP5, and both of the Heckler & Koch entities continued to represent to the PTO in the interim

that HK USA owned the MP5 trademark, notwithstanding the Assignment. On March 23, 2009,

HKG, by counsel, wrote to the PTO that an assignment of the MP5 trademark registration from

HK USA to HKG was "being worked," and therefore requested that its application for Madrid

Protocol registration be held in abeyance until the questions of ownership and the pending third-

party application could be resolved. Docket No. 332-13 at 5–7. Cooper Decl. ¶ 8. Nearly a year

later, complying with PTO deadlines for trademark registrants' periodic filing of affidavits

verifying their continued use and intent to renew their marks, HK USA filed a "Section 8/9"

5

declaration with the PTO, holding itself out as the current owner of the MP5 mark. Docket No. 332-15.

In May 2010, the PTO informed HKG that the third party's competing trademark application had been abandoned, advising HKG that it was nonetheless still necessary for HKG's ownership of the MP5 mark to be established before the company's application for U.S. registration of the MP5 could be granted. Cooper Decl. ¶ 10. HKG then recorded the Assignment with the PTO on June 20, 2010; this marked Plaintiffs' first public acknowledgment of the transfer of rights.[4] Docket No. 251-2 at 2. The PTO responded by granting HKG's registration application on November 9, 2010. Cooper Decl. ¶ 10. HKG remains the holder of the registered MP5 trademark. Am. Compl. ¶ 12.

## Procedural History

Plaintiffs contend that Defendants have failed to abide by the Settlement Agreement. Specifically, they allege that Defendants have "repackaged" the GSG-5—a "knock-off" weapon designed to "replicate the look and feel of the famous MP5®"—and sold it under the label of the GSG-522. Am. Compl. ¶ 2. By manufacturing, importing, and selling this GSG-5 in GSG-522's clothes, Plaintiffs argue, Defendants have both violated their covenant not to sell the GSG-5 and deceptively deviated from the GSG-522 design that they submitted for HK USA's approval in the Agreement. *Id.* Plaintiffs also allege that Defendants continued to manufacture and sell the GSG-5 under its own label even after the 2010 "sell-off dates." *Id.* at ¶ 3, 27–32. According to Plaintiffs, this conduct directly contravenes Paragraph 3 of the Settlement Agreement.

---

[4] Plaintiffs contend that HKG did not "accept" the Assignment until June 15, 2010. Docket NO. 330 at 11, ¶ 26 (citing Cooper Decl ¶ 10). Plaintiffs' account relies only on the declaration of HKG's attorney Isolde Kurz-Cooper, and the parties vigorously dispute whether such a delayed acceptance occurred, whether "acceptance" is even necessary for an assignment of the type executed by HK USA, and whether such an acceptance has any relevance to the parties' claims and counterclaims. We address some of these contentions below.

Bearing these grievances, Plaintiffs again brought suit against GSG and ATI. The original version of this complaint, later removed from Indiana state court to this Court, was brought by HK USA alone, and it contained only a claim for breach of contract. *See* Docket No. 1. Plaintiffs subsequently sought leave to amend the complaint to add HKG as a plaintiff and to include additional claims for tortious interference and fraud against both Defendants as well as claims of state and federal trade dress infringement, trademark dilution, and unfair competition against GSG alone. Magistrate Judge Baker granted leave to amend, Docket No. 44, and Plaintiffs filed their amended complaint on May 22, 2012. Defendants' subsequent motion to dismiss the amended complaint [Docket No. 49] was granted in part and denied in part. We dismissed Plaintiffs' claims for tortious interference with a business relationship, fraud, and common-law "unfair competition," leaving intact their claims for breach of contract, trademark dilution, statutory and common-law federal trademark infringement, and state-law trademark infringement. Docket No. 214.

Defendants have also asserted a number of counterclaims alleging that Plaintiffs wronged them in surreptitiously assigning the MP5 IP rights during the pendency of the 2009 litigation; Defendants also bring counterclaims for breach of the Settlement Agreement and seek declaratory judgments that Plaintiffs lack trade dress rights in the MP5 weapon design and that Defendants are not liable for breach of the 2009 Agreement. The tort counterclaims implicate not only HK USA, but also Weber, Ihloff and HKG. Weber signed the Assignment, and Defendants allege that Counter Defendant Ihloff, as a high-ranking officer of HKG, also knew of it. Docket No. 251 at ¶ 27. Defendants initially alleged that an additional agreement between HK USA and HKG arranged for the transfer of trade dress rights and related goodwill associated with the MP5, but after discovery they have asserted that HK USA and HKG completed the assignment in

a single signed agreement. *Id.* at ¶ 26; Docket No. 251 at ¶ 32(f)(v). On September 20, 2012, Ihloff executed a "Ratification and Consent" in which he, on behalf of HKG, announced that the company "hereby ratifies, affirms, and agrees to be bound in all respects to the Settlement Agreement" reached between HK USA and the Defendants. Docket No. 251 at ¶ 34. According to Defendants' theory, Ihloff and HKG were aware of the false representations contained in the Settlement Agreement at the time they ratified it. Docket No. 274 at 35–39.

The Court subsequently dismissed the actual fraud and constructive fraud claims against Plaintiffs and the two Counter Defendants, and it dismissed the deception and tortious interference claims against Ihloff. Docket No. 215. In its order, the Court primarily addressed Defendants' failure to establish proximate causation between their alleged damages and the misrepresentations of HK USA and its officers. *Id.*

Defendants took two steps in response to the Court's partial dismissal of their counterclaims against HK USA, HKG, Weber, and Ihloff. First, on October 30, 2013, they filed a motion for leave to file an amended answer and counterclaims. Docket No. 228. Second, they filed a motion for reconsideration. Docket No. 235. On January 14, 2014, Magistrate Judge Baker granted Defendants' motion for leave to amend, and they accordingly filed an Amended Answer that restated all of the counterclaims present in their first Answer—including those that had been dismissed by the Court—and added allegations against Ihloff and HK GmbH based on their ratification of the Settlement Agreement. *Compare* Docket No. 56 *with* Docket No. 251. We then granted Plaintiffs' renewed motion to dismiss as to Counterclaim Count II for constructive fraud, but denied the motion as to all other counts. *See* Docket No. 298. We denied Plaintiffs' subsequent motion for reconsideration. *See* Docket No. 383.

**<u>Legal Analysis</u>**

8

## Defendants' Motion to Strike

On March 17, 2014, Defendants filed a motion to strike elements of Plaintiffs' Answer and affirmative defenses to Defendants' Amended Counterclaims. Docket No. 282. The pleading that was the subject of this motion, however, has since been replaced by Plaintiffs' Amended Answer to Defendants' Amended Counterclaims [Docket No. 304], filed on May 29, 2014.

Plaintiffs' amended answer supersedes their previous answer, and it therefore renders Defendants' motion to strike moot. *See Massey v. Helman,* 198 F.3d 727, 735 (7th Cir. 1999); *Loren Specialty Mfg. Co. v. Clark Mfg. Co.*, 241 F. Supp. 493, 500 (N.D. Ill. 1965) (noting that amended answers, like amended complaints, supersede the previous pleading); *Horton Archer, LLC v. Farris Bros., Inc.*, 2014 WL 1239382, at *2 (S.D. Miss. Mar. 26, 2014) (noting that the filing of an amended answer moots a pending motion to strike).

We therefore DENY Defendants' motion to strike without prejudice.

## Motions for Summary Judgment

### Standard of Review

Federal Rule of Civil Procedure 56 provides that summary judgment should be granted when the record evidence shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. Pro. 56(a); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–323 (1986). The purpose of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Disputes concerning material facts are genuine where the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In deciding whether genuine issues of material fact exist, the court construes all

facts in a light most favorable to the non-moving party and draws all reasonable inferences in favor of the non-moving party.  *See id.* at 255.  However, neither the "mere existence of some alleged factual dispute between the parties," *id.*, 477 U.S. at 247, nor the existence of "some metaphysical doubt as to the material facts," *Matsushita*, 475 U.S. at 586, will defeat a motion for summary judgment.  *Michas v. Health Cost Controls of Ill., Inc.*, 209 F.3d 687, 692 (7th Cir. 2000).

Plaintiffs and Defendants have both filed motions for summary judgment. Plaintiffs seek summary judgment in their favor on Counts I and III through IX of Defendants' Counterclaims[5], while Defendants move for judgment on all of their own counterclaims and all of Plaintiffs' extant claims.[6]

## I.      Counterclaim Count I – Fraud

Count One of the amended counterclaims alleges actual fraud against HK USA, HK GmbH, Weber, and Ihloff.[7] To prevail on a fraud claim based on an affirmative misrepresentation, a plaintiff must establish that there was: (1) a material misrepresentation of past or existing fact which (2) was untrue, (3) was made with knowledge of or in reckless ignorance of its falsity, (4) was made with the intent to deceive, (5) was rightfully relied upon by the complaining party, and (6) which proximately caused injury or damage. *Lawyers Title Ins. Corp. v. Pokraka,* 595 N.E.2d 244, 249 (Ind. 1992); *Angel v. Powelson*, 977 N.E.2d 434, 444–445 (Ind. Ct. App. 2012).

---

[5] The Court has already dismissed Counterclaim Count II, and Plaintiffs do not seek summary judgment as to Counterclaims Counts X, XI, and XII.

[6] The Court has already dismissed Counts III, IV, and VIII of Plaintiffs' Amended Complaint; the surviving claims are Counts I, II, V, VI, VII, and IX. Defendants do not frontally challenge Plaintiffs' two contract claims (Counts I and II); rather, they contend in seeking summary judgment on their Counterclaim Count X that any recovery for Plaintiffs on those claims is foreclosed by Plaintiffs' own earlier material breach of the 2009 Agreement. *See infra,* § IX.

[7] Defendants' initial Answer contained counterclaims alleged fraud against only HK USA and Weber; it is only in this new pleading that they have added HK GmbH and Ihloff as Counter Defendants.

Defendants allege that HK USA and its president Weber engaged in fraud when they falsely represented in the 2009 Settlement Agreement that HK USA held the registered trademark and associated rights for the MP5 weapon when, in fact, they had assigned away those rights to HKG some six months earlier.[8] Plaintiffs insist that summary judgment be granted on the fraud counterclaim because: (1) there is no proof that Plaintiffs acted with intent to deceive, (2) Defendants cannot prove that they relied on any misrepresentations and that such reliance proximately caused them damages, and (3) the claim is barred as a matter of law by Indiana's "litigation privilege." We address Plaintiffs' new litigation privilege defense first, before considering whether Defendants have set forth facts sufficient to satisfy the legal elements of a fraud claim.

## A. Litigation Privilege

Indiana's "litigation privilege" is a common-law doctrine barring liability for certain statements made in the course of judicial proceedings. *Van Eaton v. Fink,* 697 N.E.2d 490, 494 (Ind. Ct. App. 1998). The privilege is based on the idea that the "public interest in the freedom of expression by participants in judicial proceedings . . . is so vital and necessary to the integrity of our judicial system that it must be made paramount to the right of the individual to a legal remedy when he has been wronged." *Briggs v. Clinton Cnty. Bank & Trust Co.*, 452 N.E.2d 989, 997 (Ind. Ct. App. 1983). Because it embodies the value of "freedom of expression," the privilege originally applied only to bar actions for defamation arising out of statements in the course of litigation. *See Hartman v. Keri,* 883 N.E.2d 774, 777 (Ind. 2008); *Miller v. Reinert,* 839 N.E.2d 731, 735 (Ind. Ct. App. 2005). The Seventh Circuit, however, has recently endorsed

---

[8] Defendants also allege that fellow Counterclaim Defendants HKG and Niels Ihloff share liability for the fraud on an agency theory through their later ratification of the Agreement. Docket No. 332 at 49–52. Because we ultimately grant summary judgment on the fraud claim and other counterclaims in which such agency liability is implicated, we do not need to address further this theory.

a limited expansion of Indiana's privilege "beyond defamation and other similar tort claims to encompass breach of contract claims"; in its 2010 decision in *Rain v. Rolls-Royce Corp.*, 626 F.3d 372 (7th Cir. 2010), the court ruled that the privilege barred a breach of contract suit asserting that a party's statements in the course of litigation violated its obligations under a prior "non-disparagement" covenant. 626 F.3d at 376–378.

In reaching this ruling, the *Rain* court noted that Indiana law was silent on the precise question at hand, and the court therefore "examine[d] the reasoning of courts in other jurisdictions addressing the same issue and applying their own law for whatever guidance about the probable direction of state law they may provide." *Rain,* 626 F.3d at 377 (quoting *Pisciotta v. Old Nat'l Bancorp*, 499 F.3d 629, 635 (7th Cir. 2007)). Plaintiffs urge that we follow that practice here, and they present a series of state court decisions in California, Florida, and New Jersey that extend the litigation privilege to bar actions for fraud (or similar torts) stemming from representations made in the course of judicial proceedings. *See* Docket No. 330 at 24–27; *Silberg v. Anderson,* 786 P.2d 365, 370 (Cal. 1990) (noting that the privilege can extend to all actions except malicious prosecution and approving its application to an intentional tort claim arising out of an attorney's lies about the identity of a witness); *Levin, Middlebrooks, Thomas, Mayes & Mitchell, P.A. v. U.S. Fire Ins. Co.*, 639 So. 2d 606, 607–608 (Fla. 1994) (extending privilege to bar a tortious interference action); *Giles v. Phelan, Hallinan & Schmieg, LLP,* 901 F. Supp. 2d 509, 523–524 (D.N.J. 2012) (applying the privilege in "expansive" fashion to apply to a number of torts).

In doing so, however, Plaintiffs ignore a caveat crucial to the Seventh Circuit's reasoning in *Rain*—that expansion of the doctrine is appropriate "where immunity from liability is consistent with the purpose of the privilege." 626 F.3d at 377. *Rain* and the cases it cited applied

the litigation privilege to claims broadly analogous to defamation; in such contexts, concern for the integrity of judicial proceedings—including the protection of statements or disclosures otherwise actionable—was thought to outweigh the interests ordinarily protected by tort or contract law. *Id.* (citing *Ellis v. Kaye-Kibbey,* 581 F. Supp. 2d 861, 880–881 (W.D. Mich. 2008); *Wentland v. Wass,* 25 Cal. Rptr. 3d 109, 114–115 (Cal. Ct. App. 2005) ("[W]hether the litigation privilege applies to an action for breach of contract turns on whether its application furthers the policies underlying the privilege")). While it is true that Indiana courts have countenanced the limited expansion of the privilege beyond its original scope as a defense to the specific tort of defamation, we are aware of no case in which they have ventured far beyond this core rationale. *Cf. Estate of Mayer v. Lax, Inc.*, 998 N.E.2d 238, 249 (Ind. Ct. App. 2013); *Rain,* 626 F.3d at 378 ("[T]he question [is] whether applying the litigation privilege in this case would promote the due administration of justice and free expression by participants in judicial proceedings."). Defendants' counterclaim for fraud alleges that HK USA and its agents lied to GSG and ATI during the 2009 litigation about having assigned away the trademark rights upon which the suit was predicated; we determine that this is not analogous to a suit for defamation or breach of a non-disparagement covenant. *See Estate of Mayer,* 998 N.E.2d at 250 (noting that the privilege does not shield from causes of action "based on the malicious or abusive use of the judicial system"). Barring suits for fraudulent inducement of settlement agreements would undermine, rather than buttress, the integrity and openness of the judicial process that the litigation privilege seeks to protect. *See Tru-Cal v. Conrad Kacsik Instrument Sys., Inc.*, 905 N.E.2d 40, 46 (Ind. Ct. App. 2009) (recognizing a cause of action for fraudulent misrepresentation in procuring a settlement of litigation). Accordingly, we decline to anticipate or predict that Indiana courts

would construct the privilege so expansively. Defendants' fraud counterclaim may thus stand or fall on its merits.

**B. Material Misrepresentation and Intent to Deceive**

The first broad prerequisite for fraud liability is the existence of an intentionally deceptive written statement. In order to give rise to liability, Plaintiffs' alleged statements in the Settlement Agreement must have been "(1) material misrepresentation[s] of past or existing fact which (2) w[ere] untrue, (3) w[ere] made with knowledge of or in reckless ignorance of [their] falsity, [and] (4) [were] made with the intent to deceive." *Lawyers Title Ins. Corp. v. Pokraka,* 595 N.E.2d 244, 249 (Ind. 1992). Defendants take issue with this formulation of the fraud standard, insisting that a misrepresentation may be actionable if the responsible party knowingly caused another to rely on it, even if it was not made with an "intent to deceive." Docket No. 349 at 28–29. In support of this—ostensibly—alternative interpretation of the governing Indiana law, Defendants cite *Rosenbaum v. Seybold,* 2011 WL 3843946 (N.D. Ind. Aug. 30, 2011), which did indeed recite a different formula.  The court there stated that a misrepresentation can serve as the basis for fraud liability where it "was made with knowledge of or in reckless ignorance of its falsity . . . [and] was made with the intent to deceive *or induce the plaintiff to act*." *Rosenbaum,* 2011 WL 3843946, at *16 (emphasis added).

The distinction, however, is illusory. As the Indiana courts have explained, the concept of intentionality is inseparable from the tort of fraud. "An intent to deceive, or 'scienter,' is an element of actual fraud, whether classified as a knowing or reckless misrepresentation or as an additional element to a knowing or reckless misrepresentation." *Wright v. Pennamped,* 657 N.E.2d 1223, 1230 (Ind. Ct. App. 1995). *See also Francis v. AIT Labs.,* 2008 WL 4585423, at *5 (S.D. Ind. Oct. 14, 2008). A tortfeasor's state of mind, of course, can seldom be proved directly;

14

evidence that a defendant knew, or should have known, that a representation would induce reliance is one of several factors that may be probative of *scienter.* "Proof of intent to deceive is determined by a review of all of the relevant factors of the particular case . . . . Where a person knowingly or recklessly makes false representations which the person knows or should know will induce another to act, the finder of fact may logically infer an intent to deceive." *In Re McGinnis,* 2010 WL 4956376, at *3 (Bankr. S.D. Ind. Nov. 30, 2010) (citing *Mayer v. Spanel Int'l, Ltd.*, 51 F.3d 670, 673 (7th Cir. 1995)).[9] Defendants' proposed definition confuses the required state of mind for fraud with a means of proving such a mental state; they are correct, however, to the extent they assert that their fraud counterclaim can survive summary judgment even if only indirect evidence of Plaintiffs' intentions exists.

Plaintiffs urge that HK USA's representations regarding its ownership of the MP5 intellectual property in the 2009 Agreement were not actually false—or, alternatively, that the representations were made in forgivable ignorance of their falsity. According to Plaintiffs, this is because the assignment was not complete until HKG accepted it in June 2010—and HK USA's recitations that they still owned the MP5 intellectual property in the 2009 Agreement were thus both true and made in good faith. We are thus presented with two questions: first, whether the Assignment was complete upon execution; and second, if so, whether HK USA and its agents intentionally deceived Defendants in 2009 by failing to disclose the Assignment.

---

[9] These cases involve the construction of a federal bankruptcy statute rather than Indiana law, but they derive the "intent to deceive" element of fraud from the common law. "The word 'fraud' implies a requirement of intent to deceive." *Mayer,* 51 F.3d at 674 (citing *Ernst & Ernst v. Hochfelder,* 425 U.S. 185 (1976); *Neal v. Clark,* 95 U.S. 704, 709 (1877)).

The first question is one of contract interpretation—and may therefore be decided as a matter of law. *TW Gen. Contracting Servs., Inc. v. First Farmers Bank & Trust*, 904 N.E.2d 1285, 1287–1288 (Ind. Ct. App. 2009) ("Summary judgment is especially appropriate in the context of contract interpretation because the construction of a written contract is a question of law."). Both parties concede that Virginia law governs the Assignment, which was executed in Virginia by HK USA, a firm incorporated in that state. *See* Am. Compl. ¶ 5; Docket No. 251-2 at 5. Pointing to a decision of the Eastern District of Virginia, *McCloskey & Co., Inc. v. Wright*, 363 F. Supp. 223 (E.D. Va. 1973), Plaintiffs note the general rule that since mutual assent is required for a contract to be valid, "an assignment does not take effect until the assignee has tendered formal acceptance." 363 F. Supp. at 228 (citing 6A C.J.S. § 73). We can thus conclude as a matter of law that the Assignment was complete only when HKG had manifested its assent to the transfer.[10]

Plaintiffs' contention that HKG did not manifest this assent until it "accepted" the Assignment in June 2010, however, is contradicted both by the text itself and by Plaintiffs' previous statements to the Court. The Assignment speaks of the two entities' meeting of the minds in the past tense, reciting that they had exchanged "good and valuable consideration, receipt of which is hereby acknowledged." Docket No. 251-2 at 5. In their court filings, Plaintiffs have conceded, implicitly or explicitly, that the Assignment was effective at the date of its execution, just as it appears to be on its face. In a reply brief in support of their motion to amend their complaint, Plaintiffs stated in March 2012 that the MP5 "rights were assigned on March 19,

---

[10] Defendants cite an Eastern District of Virginia bankruptcy decision for the proposition that an assignment becomes valid and "irrevocable" when properly supported by consideration. *See* Docket No. 370 (Defs.' Sur-Reply) at 7 (citing *In re Himes*, 53 B.R. 948, 951 (Bankr. E.D. Va. 1985)). As Defendants' own citations to *Williston on Contracts* make clear, however, an assignment—like any other contract—requires the mutual assent of the parties to be valid. *See* 29 Williston on Contracts § 74:3 (4th ed.). While Defendants are thus correct to assert that an assignment is irrevocable once completed, their argument skips a step.

2009," and that "[a]ssignment of the registered MP5 marks from HK USA to HK GmbH, a matter of public record, was effectuated March 19, 2009 and recorded on June 20, 2010." Docket No. 39 at 7, 8–9. More recently, in answering Defendants' amended counterclaims, Plaintiffs stated that the "publicly-filed Short Form Assignment speaks for itself." Docket No. 265 at ¶ 26. Still more recently, in a November 2014 motion for interlocutory appeal of an earlier ruling, Plaintiffs unequivocally state, as "undisputed" facts, that: "HK USA assigned the MP5 trademark to HKG on March 19, 2009" and "HK did not disclose the assignment of the trademark to GSG/ATI before the execution of the Settlement Agreement." Docket No. 399 at 6, ¶¶ 2, 6. The only evidence that Plaintiffs present to support their theory of a belated 2010 "acceptance" by HKG is the declaration of HKG's attorney, Isolde Kurz-Cooper. Cooper Decl. ¶ 10. Plaintiffs do not claim that there was any written memorialization of this acceptance, nor does Cooper provide any further details than this bare assertion. Even assuming that Cooper had the requisite first-hand knowledge to convert her statement into admissible evidence, we decline to accept Plaintiffs' newly-proffered and clearly self-serving theory when it cuts so clearly against the consistent body of their own statements on the question.[11] *See Bank Leumi Le-Israel, B.M. v. Lee,* 928 F.2d 232, 237 (7th Cir. 1991) ("We have consistently held that a genuine issue of material fact cannot be established by a party contradicting his own earlier statements unless

---

[11] Plaintiffs assert in reply that the incongruity between their body of earlier statements and their new theory stems from the fact that they were simply unaware of the thrust of Cooper's testimony on the matter until Cooper informed them of the point on May 26, 2014 as they were preparing for summary judgment. They had not earlier inquired into the matter, Plaintiffs' counsel now state, because they "simply did not believe facts relating to the Assignment were ... important" until after the Court ruled against their motion to dismiss the amended counterclaims in May 2014. *See* Docket No. 363 at 11. We do not think that inattention to an obviously material factual issue is a "plausible explanation" for Plaintiffs' abrupt change of course. Moreover, the explanation Plaintiffs proffer here is rather undermined by their assertion, in a motion filed *after* the ones before us, that the March 2009 execution of the Assignment and HK USA's failure to disclose it in the October 2009 Agreement were "undisputed" facts. *See* Docket No. 399 at 6, ¶¶ 2, 6.

there is a plausible explanation for the incongruity.") (citing *Richardson v. Bonds,* 860 F.2d 1427, 1433 (7th Cir. 1988)).

A genuine issue of material fact remains, however, with respect to Plaintiffs' intent to defraud. HK USA's president G. Wayne Weber, who signed both the Assignment and the Agreement on the company's behalf, did state that he "expected them [GSG, ATI, and Orion] to rely on the representations made by HK" in the discussions leading to the 2009 settlement. Docket No. 332-1 (Weber Aug. 2014 Dep.) at 91–92.[12] Nonetheless, he maintained in his testimony that, in his view at the time, the Assignment had no direct bearing on the ongoing 2009 litigation: "I really didn't compare the two or relate the two. This was an internal document between HKG and HKI, in my opinion."[13] Docket No. 330-5 (Weber June 2014 Dep.) at 55–56. In other words, as Plaintiffs have argued, Weber did not see the Assignment as material to the 2009 Agreement because the settlement expressly bound not only HK USA, but any "parents, subsidiaries, successors, and assigns." Docket No. 45-1 at 5, ¶ 21. A reasonable jury could infer Plaintiffs' deceptive intent from the plain words and meaning of the Assignment itself, but Defendants have offered no evidence that directly contradicts Weber's account.  We therefore conclude that the issue of intent cannot be resolved in either party's favor at this stage of the proceedings.

**C. Reliance and Proximate Causation**

---

[12] While Weber was asked in this deposition, more specifically, if he intended GSG and ATI to rely on the representations HK USA made in the *agreement,* he answered in different form, stating: "I expected them to rely on the representations made by HK *during this meeting,* yes." Weber 2014 Dep. at 92 (emphasis added).

[13] This account is lent at least some plausibility by the fact that HK USA and HKG are, as their names suggest, corporate affiliates. Though the entities were separated by two "layers" at the time, Heckler & Koch GmbH (HKG) was and is the "ultimate parent" company of Heckler & Koch, Inc. (HK USA). Weber Apr. 2013 Dep. (Docket No. 330-2) at 51–55.

The intertwined issues of reliance and proximate cause have been the focus of the parties' arguments through several stages of the litigation. We conclude, at last, that Defendants have failed to meet their evidentiary burden, and that summary judgment on the fraud counterclaim must therefore be granted in Plaintiffs' favor.

For a claimant to recover under a fraud theory, "it must show that it had a right to rely on the . . . misrepresentations and that it did in fact rely on the misrepresentations to its detriment." *Young v. Thompson,* 794 N.E.2d 446, 448 (Ind. Ct. App. 2003) (quoting *Scott v. Bodor, Inc.* 571 N.E.2d 313, 321 (Ind. Ct. App. 1991)). The right of reliance may often be more difficult to determine than the fact of reliance, for "the legal obligation that a person exercise the common sense and judgment of which he is possessed is a practical limitation on the actionability of various representations." *Plymale v. Upright,* 419 N.E.2d 756, 762 (Ind. Ct. App. 1981). In order to prevail on their fraud counterclaim, Defendants must therefore establish that they reasonably relied on HK USA's misrepresentations with respect to its ownership of the MP5 rights contained in the 2009 Settlement Agreement, and that this reliance proximately caused their damages. *See* Docket No. 251 at ¶¶ 38–39.

### 1. The right of reliance

The parties first join issue on the *right* of reliance—whether a litigant in the position of GSG and ATI in the 2009 litigation could ever reasonably rely on the representations of their party opponents in the preliminary clauses of a settlement agreement. In a previous ruling on Plaintiffs' motion to dismiss the fraud counterclaim, we concluded that Defendants had adequately stated a claim with respect to reliance; in doing so, we refused to foreclose, as a matter of law, the possibility that GSG and ATI could have reasonably relied on Plaintiffs'

misrepresentations in signing the 2009 Agreement. *See* Docket No. 215 at 16–17. Plaintiffs now

urge that no right of reliance ever existed, for two reasons: first, because the alleged

misrepresentations were only "preliminary recitals" to a contract and thus not the proper subjects

of reliance; and second, because adversaries in a lawsuit cannot reasonably rely on the

representations of their opponents in arm's length settlement negotiations.

      Plaintiffs assert that, because the preliminary recitals of a settlement agreement are

"typically restatements of the very issues over which the parties disagreed in the litigation," they

should not be considered "misrepresentations" giving rise to an opponent's reasonable reliance.

Docket No. 330 at 17–18. "[I]n nearly 200 years of jurisprudence," they add, "Counterclaim

Defendants are not aware of a single Indiana state court opinion holding that the preliminary

recitals of a settlement agreement may form the basis of a fraud claim." *Id.* While Plaintiffs are

correct that Indiana law has not endorsed recovery for a fraud claim based on such "preliminary

recitals," neither has it specifically foreclosed such a possibility. Rather, Indiana courts have

recognized that preliminary recitals, although less probative than the language of the "body" of a

contract, may be useful in interpreting the contract as a whole. In *Stech v. Panel Mart, Inc.*, 434

N.E.2d 97 (Ind. Ct. App. 1982), the Indiana Court of Appeals read a preliminary recital as

"clearly establish[ing] the intention of the parties" and as "eras[ing] the ambiguity" which

clouded the body of the contract as to its meaning. 434 N.E.2d at 101. *Cf. Kerfoot v. Kessener*,

84 N.E.2d 190, 199 (Ind. 1949) (observing that "the preliminary recitals of the contract may be

of some value, but they are not contractual, and can not [sic] be permitted to control the express

provisions of the contract which are contractual in nature"). The Seventh Circuit, in a decision

applying Indiana law, ruled that a party was estopped from reciting in a contract's preliminary

clauses that it was "engaged in the business of selling scientific and rare earth metals" and then

later claiming to be inexperienced in the subject. *Taurus Holding Co. of Am., Inc. v. Thompson,* 129 F.3d 1268, at *36 (7th Cir. 1997).[14] To be sure, where a settlement agreement expressly states that its contents are jointly authored, as does the Agreement here, *see* Docket No. 45-1 at ¶ 15, it is implausible as a matter of fact that one party could "rely" on *any* statement contained in the agreement, or that such reliance would be reasonable—as we discuss below. But we believe it is fair to construe the statements that "HK owns a federal trademark registration in the mark 'MP5'" and "HK claims to own in the United States a proprietary trade dress comprised of the design of certain elements of the MP5 firearms" as the distillation of HK USA's litigation stance, which it was reaffirming in writing by endorsing the jointly-constructed Agreement. Docket No. 45-1 at 1, ¶ 15.

Second, Plaintiffs assert that GSG, ATI and Orion cannot have reasonably relied on HK USA's representations in the Agreement because it was a settlement negotiated at arm's length, and as such, Defendants' "duty . . . to be diligent in safeguarding [their] interests" foreclosed any right of reliance. *See Young,* 794 N.E.2d at 449 (citing *Plymale,* 419 N.E.2d at 762). In doing so, they rely primarily on *Prall v. Indiana National Bank,* 627 N.E.2d 1374 (Ind. Ct. App. 1994), in which the Indiana Court of Appeals rejected the argument of a party to a liability release agreement that it had been fraudulently induced to sign the agreement by false oral representations. 627 N.E.2d at 1378–1379. There, the court found that the plaintiff had "presented no evidence or argument to show that [defendant's] alleged misrepresentations about

---

[14] As Plaintiffs point out, *Taurus Holding* is an unpublished decision without precedential weight. We cite it only for its illustrative value, and not under any misapprehension that it is controlling. Plaintiffs also note that the court in *Taurus Holding Co.* rejected a claim for fraud on the grounds that the claimant had not established its reasonable reliance. *See* Docket No. 363 at 5. While this is true, it is beside the point; we cited the case in an earlier order—as Defendants cite it now—not on the factual issue of reliance, but to support the notion that Indiana law need not view a contract's preliminary recitals as entirely meaningless.

the disbursements induced him to sign the release . . . . Also, in executing the release [plaintiff]

was an adverse party dealing at arms length with [defendant]." *Id.* at 1379.

We agree with Defendants that the present case is distinguishable, and the general rule

Plaintiffs seek to derive from *Prall* is overbroad. *Prall* dealt with an agreement's integration

clause, and the policy interest in reconciling the possibility of claims for fraudulent inducement

with the dictates of the parol evidence rule. As the Indiana court in a similar case put it: "The

exception for a party who has 'been induced by a fraudulent misrepresentation to enter the

contract,' must not be stretched or inflated in a way that would 'severely undermine the policy of

the parol evidence rule.'" *Circle Ctr. Dev. Co. v. Y/G Ind., L.P.*, 762 N.E.2d 176, 180 (Ind. Ct.

App. 2002) (quoting *Urschel Farms, Inc. v. Dekalb Swine Breeders, Inc.*, 858 F. Supp. 831, 840

(N.D. Ind. 1994)). Here, Defendants do not seek to void a release on the grounds that it was

fraudulently induced by oral statements; rather, the misrepresentations to which they point are

present on the face of the Agreement itself. *See Tru-Cal, Inc. v. Conrad Kacsik Instrument Sys.,

Inc.*, 905 N.E.2d 40, 46 (Ind. Ct. App. 2009) (distinguishing *Prall,* which "dealt with alleged oral

misrepresentations made prior to the execution of the contract," from facts in which "the alleged

fraud . . . involves a forged employment agreement that was filed in a court of law").

Plaintiffs also overreach in citing *Prall* as establishing a general rule that "[a] prerequisite

to the right of reliance is that the relying party be in a subordinate position."[15] Docket No. 330 at

---

[15] A special relationship between the parties is a *per se* requirement for *constructive* fraud liability. A party may be liable for constructive fraud on the basis of its omissions as well as its affirmative misrepresentations, so long as its relationship with the defrauded party is fiduciary in nature, or—in a buyer-seller context—where it enjoys "the unique possession of knowledge not possessed by the other and may thereby enjoy a position of superiority over the other." *Mullen v. Cogdell*, 643 N.E.2d 390, 401 (Ind. Ct. App. 1994). As Plaintiffs point out, we have already ruled, on a previous motion to dismiss, that there was no such special relationship between the parties here that could support a constructive fraud claim. *See* Docket No. 215 at 19–20. The absence of such a relationship is not fatal to a claim for actual fraud, however.

19 (citing *Prall,* 627 N.E.2d at 1379). Instead, Indiana law cautions that while a party who was not in a subordinate bargaining position may still be the victim of fraud, such a party has no excuse from its duty to "exercise the common sense and judgment of which he is possessed." *Thompson,* 794 N.E.2d at 448. "[W]here persons stand mentally on equal footing, and in no fiduciary relation, the law will not protect one who fails to exercise common sense and judgment." *Id.* (quoting *Plymale,* 419 N.E.2d at 762). This means, for instance, that a party negotiating at arm's length—and represented by an attorney—cannot claim to have been defrauded by an agreement he failed to read carefully. *See Plymale,* 419 N.E.2d at 762 ("Common sense dictates, and our system of jurisprudence requires . . . that parties engaged in the negotiation of a contract . . . be obligated to protect their interest by reading the attendant documents before signing."). Nor can a party to an agreement claim that he was defrauded if he "plainly had the means at hand to unearth the fraud" before signing on. *See Tru-Cal,* 905 N.E.2d at 46. Here, however, it is not apparent that the falsity of HK USA's representation could have been revealed by the exercise of reasonable diligence. Although it may true, as Plaintiffs insist, that the PTO website showed a record of HKG's request that its own application for the MP5 trademark be held in abeyance because an assignment of the rights from HK USA was "being worked," Docket No. 330-3 at 22, accessing this information would hardly have given GSG and ATI notice that the assignment was *complete. See* Docket No. 363 at 3. PTO records showed as of October 2009 that HK USA was the registered holder of the MP5 trademark, and indeed it still was; neither the PTO nor anyone else outside the Heckler & Koch corporate family was apparently aware that an assignment of the rights had already been executed. Under such circumstances, we cannot conclude that any reliance upon HK USA's alleged misrepresentations would have been inherently unreasonable.

23

### 2.   The fact of reliance

It is upon the *fact* of reliance that Defendants' fraud counterclaim founders. In denying Plaintiffs' motion to dismiss, we concluded that Defendants had successfully pleaded their reliance, judging that "it is at least plausible that [Defendants'] willingness to pay $300,000 to settle the [2009] litigation reflected their judgment that HK's claims of trademark infringement had merit—a judgment informed by HK's representations that it owned the MP5 trademark." Docket No. 215 at 16–17. In a second ruling on Plaintiffs' motion to dismiss the amended counterclaim, we held that Defendants had also sufficiently pleaded proximate causation. *See* Docket No. 298 at 17–23.[16] We have also observed, however, that Defendants' theories face an "uphill evidentiary climb"—for in order to prevail on their claim, they must "reconstruct history, showing that a misrepresentation caused them damages they would not have suffered otherwise." Docket No. 298 at 29–30. As the Seventh Circuit has often bluntly stated, "summary judgment is the 'put up or shut up' moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events." *Johnson v. Cambridge Indus., Inc.*, 325 F.3d 892, 901 (7th Cir. 2003) (quoting *Schacht v. Wis. Dep't of Corr.*, 175 F.3d 497, 504 (7th Cir. 1999)). Measured against that standard, we find Defendants' evidence of reliance wanting.

---

[16] In doing so, we noted Defendants' plausible allegations concerning the effect of the assignment on Plaintiffs' standing to bring the 2009 lawsuit (and, accordingly, the amount of damages it could have recovered had its assignment of the IP rights been disclosed), as well as the testimony of Defendants' expert Kenneth Germain that the Assignment had weakened the value of the underlying trademark and trade dress rights. *See* Docket No. 298 at 18–22. We do not need to revisit these conclusions under the more exacting summary judgment standard, because we conclude that Defendants have failed to establish the element of reliance—which is, of course, a prerequisite to the existence of proximate causation and damages in a fraud claim.

The strongest evidence weighing against Defendants is the Settlement Agreement itself. One of the Agreement's preliminary recitals reads as follows:

> WHEREAS, GSG, ATI and Orion have filed in said Lawsuit *Defendants' Answer and Counterclaim* in which they seek a judgment declaring, *inter alia,* that their activities do not infringe, and have not infringed, any intellectual property rights of HK or otherwise violate any law, and that HK does not own the trademark, trade dress and other intellectual property rights it claims to own.

Docket No. 45-1 at 1. In the body of the Agreement itself, Defendants make the following statement:

> 9. *No admission of liability.* In entering into this Agreement, Defendants make no admission of liability for the claims made against them in the Lawsuit or otherwise acknowledge the existence of any rights claimed by HK. Similarly, HK makes no admission of the validity of Defendants' contentions and/or claims in this proceeding against HK.

*Id.* at ¶ 9 (emphasis added). Defendants counter that these statements in the Agreement are "nothing other than a rephrasing of Defendants' counterclaim in the 2009 Litigation," and were not intended to reflect Defendants' actual *belief* at the time the Agreement was signed. Docket No. 349 at 25. This argument is a double-edged sword for Defendants: if these contractual statements are not construed as "representations" on their part, then the preliminary recitals on which the entire fraud counterclaim is based—whose language is markedly similar—can hardly be construed as "representations" themselves.[17] *See* Docket No. 45-1 at 1. The Agreement stipulates that it has been "drafted jointly by all of the parties" in its entirety. *Id.* at ¶ 15. Either this nominal joint authorship renders its characterizations of the parties' respective positions unfit to be attributed to either party individually—in which case the foundation of the fraud

---

[17] One preliminary clause in the Agreement recites that "HK *claims* to own in the United States a proprietary trade dress comprised of the designs of certain elements of the MP5 firearms (the 'MP5 trade dress')," while another states more emphatically that "HK *owns* a federal trademark registration in the mark 'MP5.'" Docket No. 45-1 at 1 (emphasis added). Since Plaintiffs did not claim in the 2009 Litigation (or now) that Defendants infringed the MP5 trade mark itself, it is the representation concerning trade dress that is more relevant.

counterclaim falls away entirely for lack of any specific misrepresentation on Plaintiffs' part—or the parties' statements therein should be taken at face value, in which case Defendants expressly disclaimed reliance. *Id.* at ¶ 9.

Even if we look beyond the Agreement's text, Defendants have proven unable to show any affirmative evidence that they relied upon Plaintiffs' false statement of ownership to their detriment. Defendants argue that they assumed in October 2009 that HK USA owned the trademark and trade dress that it claimed to own, and that it was only based on that assumption that they were willing to pay HK USA $300,000 and cease production of their GSG-5 weapon. Docket No. 349 at 23. It is a plausible explanation. But there is at least one other plausible explanation—that GSG and ATI settled in order to put an end to expensive litigation, stifle bad publicity, or protect business relationships,[18] and that they meant what they said in the Agreement disclaiming any reliance on HK USA's claim to have enforceable rights in the MP5. At any rate, argument—no matter how plausible—is insufficient to survive summary judgment; Defendants need *evidence* supporting an inference of reliance. They must show evidence permitting a fact-finder to conclude not only that signing the Agreement with Plaintiffs turned out to be a bad deal for Defendants, but that Defendants entered into that Agreement—and incurred those damages—specifically in reliance upon the misrepresentations at issue.

Defendants point to three pieces of testimony on the question, but none suffices to carry their burden. The first is the deposition of ATI president Anthony DiChario, who answered a question on cross-examination as follows:

---

[18] Defendants contend in support of their claim for tortious interference that ATI president DiChario was pressured to settle the 2009 litigation by Plaintiffs' subpoenas of ATI's business partners and the threats of further subpoenas. *See* Docket No. 118-1 at ¶ 8.

> Q: So if what I'm understanding is correct, the only thing that would have kept
> you from signing that very same Settlement Agreement with HK Germany as
> opposed to HK USA was your belief, whether correct or not, that HK Germany is
> not allowed to bring a lawsuit in this country against you; is that right?
>
> …
>
> A: I told you I would not settle the suit with [HK] Germany. There would be no
> cause to it, no reason, no ability for them to control the commerce here in
> America unless they had an interest like HK USA here. I know that. I knew that
> when the suit started and it's not an option. I would not settle.

Docket No. 332-7 (DiChario Dep.) at 307. DiChario's testimony speaks to the strategic

considerations governing the decision to settle a hypothetical 2009 suit initiated by HKG rather

than HK USA; he did not testify as to whether GSG and ATI actually believed HK USA's

representations or acted according to that belief.

Second, Defendants point to the testimony of GSG president Michael Swoboda, who

testified in 2012 to his understanding of the nature of his company's fraud counterclaim against

HK USA:

> Q: Can you describe for me what your understanding was of the nature of those
> [counter]claims?[19]
>
> …
>
> A: One point is as I know that we have made a Settlement Agreement with the
> company. They have had no rights at all. So I'm a German, I know a little bit [sic]
> German. I'm not familiar with the U.S. law, but I can speak only for German law.
> If you make an agreement with company [sic] that has no rights it's fraud and my
> opinion is [that this] Settlement Agreement we have made is only confetti,
> nothing more, because this company has had no rights at all, because they refer to
> the rights of another company.

Docket No. 332-2 (Swoboda Dep.) at 318–319. Mr. Swoboda's testimony establishes that, as of

2012, he believed that his company had been defrauded by HK USA—at least according to the

---

[19] Defendants' counsel objected to this question on the grounds that it called for a legal conclusion. While the
objection likely has merit, we present the testimony since it is Defendants who now designate it in their favor.

standards of German law. It says nothing at all, however, about whether Defendants relied on the

misrepresentations at issue in 2009.

Finally, Defendants refer us to the testimony of their expert Dr. Kenneth Germain, who

opined:

> The ownership issues that had developed by the time of the Settlement Agreement
> in the 2009 litigation so significantly undermined the validity of the MP5
> registration and the enforceability of the MP5 mark that the HK Entities had
> unwarranted leverage to extract concessions from GSG/ATI because of the HK
> Entities' failure to disclose the vulnerability of the trademark to GSG/ATI.

Docket No. 251-3 (Germain Report) at 6. Accepting Germain's opinions as correct for the

purposes of this motion would support the conclusion that the Settlement Agreement was worth

less than the price Defendants paid for it. But as an outside expert, Germain did not, and could

not, testify to the separate question of whether HK USA's "unwarranted leverage" *actually*

influenced Defendants' calculations in signing the Agreement.

It seems clear to us that HK USA, at the very least, conducted itself in an underhanded

manner by initiating a suit for trade dress infringement, assigning away the rights that formed the

basis of the suit, and then settling the suit without disclosing the Assignment. Such behavior may

have been subject to sanction by the court with jurisdiction over the 2009 Litigation. Liability for

fraud is a different matter, however. As regrettable as it may be to allow such a failure of

forthrightness to go unpunished, the law intentionally gives fraud claimants a steep mountain to

climb, for "fraud is easy to allege and difficult to prove."  *See Bower v. Jones,* 978 F.2d 1004,

1012 (7th Cir. 1992). Defendants' claim here is fatally undermined by the plain text of the

Agreement disavowing any reliance. While we recognize, of course, the abstract possibility that

such language was disingenuous boilerplate, a reasonable fact-finder would need affirmative

evidence to find it so. Defendants have come forth with some evidence that the Agreement was

harmful to their interests, but not that it was Plaintiffs' misrepresentations, rather than other considerations, that prompted them to enter into it.

We accordingly GRANT Plaintiffs' motion for summary judgment on Counterclaim Count I and DENY Defendants' motion for summary judgment on that count.

## II.        Counterclaim Count III – Deception Under Indiana Code § 35-43-5-3(a)

Defendants' Counterclaim Count III seeks treble damages under the Crime Victim Relief Act for Plaintiffs' crime of "deception." Docket No. 251 at ¶¶ 69–72. Both parties seek summary judgment on this count.

Indiana's Crime Victim Relief Act (CVRA), Ind. Code § 34-24-3-1, provides that a person who "suffers a pecuniary loss" as a result of another person's violation of certain criminal statutes may recover treble damages and other costs and fees. Ind. Code § 34-24-3-1. Among the crimes for which victims may obtain recovery under the CVRA is "deception," a Class A misdemeanor defined for purposes of this action as "knowingly or intentionally mak[ing] a false or misleading written statement with intent to obtain property, employment, or an educational opportunity." Ind. Code § 35-43-5-3(2). The factual allegations underpinning Defendants' counterclaim for deception are the same as those upon which the fraud counterclaim is based— that Plaintiffs lied about their ownership of the MP5 intellectual property in the 2009 Settlement Agreement. Docket No. 251 at ¶¶ 69–70.

Plaintiffs seek summary judgment on three grounds: that the counterclaim is barred by the CVRA's statute of limitations, that Defendants have failed to establish the prerequisite elements for tort recovery, and that the counterclaim is barred by Indiana's litigation privilege. Plaintiffs' argument for the application of the litigation privilege merely reprises the theory they

presented in relation to the fraud counterclaim, *see* Docket No. 330 at 33; we therefore reject that argument for the same reasons we outlined above. We address Plaintiffs' two remaining arguments in turn.

## A. The Statute of Limitations

Because claims under the CVRA are "penal" in nature, Indiana courts have determined that a two-year statute of limitations applies. *Clark v. Univ. of Evansville,* 784 N.E.2d 942, 945–946 (Ind. Ct. App. 2003) (citing *Browning v. Walters,* 616 N.E.2d 1040, 1046 (Ind. Ct. App. 1993)). As Defendants point out, however, the state's "fraudulent concealment" statute may influence the two-year period's starting point: "If a person liable to an action conceals the fact from the knowledge of the person entitled to bring the action, the action may be brought at any time within the period of limitation *after the discovery* of the cause of action." Ind. Code § 34-11-5-1 (emphasis added). This provision "effectively moves the date on which the statute of limitation[s] begins to run forward from the date of the alleged tort to the discovery date." *Alldredge v. Good Samaritan Home, Inc*., 9 N.E.3d 1257, 1262 (Ind. 2014) (citing *Malachowski v. Bank One, Indianapolis,* 590 N.E.2d 559, 563 (Ind. 1992)).

Defendants first asserted this deception counterclaim on July 13, 2012, when they filed their first Answer and Counterclaims. *See* Docket No. 56. The claim is therefore barred by the two-year statute of limitations if Defendants knew of, or should have known of, the alleged deception before July 13, 2010. *See Laun v. Laun,* 2008 WL 90778, at *12–15 (N.D. Ind. Jan. 9, 2008). Plaintiffs insist that, even if the "date of discovery" rule applies, the two years should have begun to run on June 20, 2010, when Plaintiffs filed the Assignment with the PTO—thus,

according to their account, giving Defendants "constructive notice" of the alleged deception they had suffered. Docket No. 330 at 31–32 (citing 15 U.S.C. § 1060(4)).

The key issue raised by Plaintiffs' statute of limitations defense is therefore whether, and for how long, Plaintiffs concealed the Assignment from Defendants after the date the alleged harm occurred in 2009. "The law narrowly defines concealment, and generally the concealment must be active and intentional." *Olcott Int'l & Co. v. Micro Data Base Sys., Inc.*, 793 N.E.2d 1063, 1072 (Ind. Ct. App. 2003). "The affirmative acts of concealment must be calculated to mislead and hinder a plaintiff from obtaining information by the use of ordinary diligence, or to prevent inquiry or elude investigation. There must be some trick or contrivance intended by the defrauder to exclude suspicion and prevent inquiry." *Johnson v. Blackwell,* 885 N.E.2d 25, 32 (Ind. Ct. App. 2008). As to the alleged victim, "to invoke the protection provided by this statute . . . the plaintiff is charged with the responsibility of exercising due diligence to discover the claims." *Malachowski,* 590 N.E.2d at 563–564 (citing *Hinds v. McNair,* 129 N.E.2d 553, 560 (Ind. 1955)).

This is a strenuous standard, and Plaintiffs lean on it, arguing that, had Defendants exercised due diligence, they would have discovered the publicly-available PTO record of the assignment any time after HKG registered it in June 2010. Docket No. 330 at 32 (citing Docket No. 251-2). But even if it is true that Plaintiffs were guilty of no "active and intentional" concealment after they registered the Assignment with the PTO, it would be unreasonable to expect GSG and ATI to be vigilant in searching PTO records in June 2010 on the off-chance that they might find that HK USA had deceived them in a long-since-completed negotiation. HK USA's failure to disclose the Assignment when the disclosure would have had relevance—that is, during the 2009 litigation—was arguably the type of concealment necessary to toll the

31

limitations period. Defendants state that they did not learn of the Assignment until Plaintiffs

incidentally disclosed it on February 10, 2012 in the connection with the current litigation, and

they asserted the deception counterclaim some five months thereafter. *See* Docket No. 39

(Plaintiff's motion to amend complaint). Summary judgment is inappropriate on Plaintiffs'

statute of limitations defense where there is at least a question of fact as to whether, in the

exercise of reasonable diligence, Defendants should have known about the cause of action before

they actually learned of it. *See Laun,* 2008 WL 90778, at *12–15 (finding summary judgment not

warranted on a CVRA claim because there was a genuine factual issue regarding the claimant's

date of discovery). The statute of limitations issue is ultimately academic, however, because

Defendants have not established the necessary elements of their deception claim.

**B. Elements of the Deception Claim**

The CVRA is "punitive in nature and must be strictly construed." *Flaherty & Collins,*

*Inc. v. BBR-Vision I, L.P.*, 990 N.E.2d 958, 968 (Ind. Ct. App. 2013); *NationsCredit Commercial*

*Corp. v. Grauel Enters., Inc.,* 703 N.E.2d 1072, 1078 (Ind. Ct. App. 1998). In order to obtain a

civil recovery under the statute, Defendants must accordingly "show a violation of at least one of

the code sections listed in the statute and must demonstrate that the violation caused the loss

suffered by the plaintiff." *Flaherty,* 990 N.E.2d at 968 (citing *McLemore v. McLemore,* 827

N.E.2d 1135, 1144 (Ind. Ct. App. 2005)).

In addition to proof of a prohibited act and proximate causation, Plaintiffs contend that

Defendants are required to establish reliance, just as they were in order to recover for fraud.

Docket No. 330 at 32. Plaintiffs rely for this assertion primarily on *Puller Mortgage Associates,*

*Inc. v. Keegan,* 829 F. Supp. 1507 (S.D. Ind. 1993), a decision in which the Southern District of

Indiana court found that deception and other statutory offenses are "based on and are essentially permutations of" common law fraud—and thus implicitly endorsed the notion that proof of reliance is a prerequisite of recovery for deception under the CVRA. 829 F. Supp. at 1521. This is not quite correct. As the United States Supreme Court has noted, "[r]eliance is not a general limitation on civil recovery in tort; it 'is a specialized condition that happens to have grown up with common law fraud.'" *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 655–656 (2008) (quoting *Anza v. Ideal Steel Supply Corp.,* 547 U.S. 451, 477 (2006) (Thomas, J., concurring in part and dissenting in part)). In Indiana, of course, "no common-law crimes exist, and the legislature fixes the elements necessary for any statutory crime. We may not read into a statute that which is not the expressed intent of the legislature." *Am. Heritage Banco, Inc. v. McNaughton,* 879 N.E.2d 1110, 1117–1118 (Ind. Ct. App. 2008) (quoting *Knotts v. State,* 187 N.E.2d 571, 573 (Ind. 1963) (additional citations omitted)). A reliance element is prescribed in neither the deception criminal statute, Ind. Code § 35-43-5-3(a), nor the CVRA statute providing for civil recovery, Ind. Code § 34-24-3-1, nor the Indiana case law interpreting the CVRA, *Flaherty & Collins,* 990 N.E.2d at 968; *Squires v. Utility/Trailers of Indianapolis, Inc.*, 686 N.E.2d 416, 420–421 (Ind. Ct. App. 1987). We therefore decline, in accord with the Indiana courts, to read an explicit reliance requirement into these statutes. *See Am. Heritage Banco,* 879 N.E.2d at 1118; *Decatur Ventures, LLC v. Stapleton Ventures, Inc.*, 373 F. Supp. 2d 829, 851 (S.D. Ind. 2005) ("The Plaintiffs must simply show by a preponderance of the evidence that the Defendants committed the crime of deception, and that as a result Plaintiffs suffered a pecuniary loss.").

Plaintiffs' argument for summary judgment prevails in spite of their definitional overreach, however. Here, as is so often the case, proof of reliance is intertwined with proof of

proximate cause. In order for one party's act to be the proximate cause of another's harm, it "must have set in motion a chain of circumstances that in natural and continuous sequence lead to the resulting injury. Proximate cause requires, at a minimum, that the harm would not have occurred but for the defendant's conduct." *Carey v. Ind. Physical Therapy, Inc.*, 926 N.E.2d 1126, 1129 (Ind. Ct. App. 2010) (citing *Hamilton v. Ashton,* 846 N.E.2d 309, 316 (Ind. Ct. App. 2006)). The only pathway in this case through which Plaintiffs' written misrepresentations could have harmed Defendants is the Settlement Agreement—and those misrepresentations could not have been the "but for" cause of Defendants' decision to sign that Agreement unless Defendants *relied* upon them. Defendants attempt to establish proximate cause by pointing to evidence that the Agreement damaged them, chiefly because Plaintiffs' loss of standing after the Assignment undermined the strength of their infringement claims.[20] But this evidence suffers from the same fundamental flaw as Defendants' putative evidence of reliance: it may establish the materiality of Plaintiffs' misrepresentations, but it fails to build a bridge between the lie and the loss—in particular, by offering no counterweight to Defendants' own contractual disclaimer of reliance.

For the same reason that we granted Plaintiffs' motion for summary judgment against the fraud counterclaim, we therefore GRANT Plaintiffs' motion for summary judgment as to

---

[20] Defendants incorporate here by reference their proximate cause evidence in connection with the fraud counterclaim. *See* Docket No. 349 at 44; 39–42. Of particular salience is an excerpt from the expert report of Kenneth Germain, in which he opines that "falsehoods imperiling the continued vitality of the MP5 mark almost certainly caused GSG/ATI to settle on terms more favorable to the HK Entities than a weakened or invalid mark would have justified." Docket No. 251-3 at 9, ¶ 19. If accepted as true, this tends to establish that the weakness of HK USA's claim to own the intellectual property rights, unbeknownst to Defendants, made the settlement terms more beneficial for HK USA than they should have been. To the extent that this statement implies that the "falsehoods imperiling the continued vitality" *caused* Defendants to *decide* to settle—rather than caused the Agreement to be unfavorable, we determine that any such assertion by Germain is speculative and outside his expertise, which is in trademarks and intellectual property law, not Defendants' decision-making process. *See* Docket No. 251-3 at ¶ 1 (expert credentials). As we have stated above, drawing an inference of reliance from the unfavorable nature of the Agreement to Defendants in light of later-disclosed facts is unreasonable when weighed against the structure and language of the Agreement itself.

Defendants' Counterclaim Count III for deception, and DENY Defendants' motion for summary judgment on that count.

## III.    Counterclaim Count VII – Tortious Interference with Business Relationship

Both parties seek summary judgment on Count VII of Defendants' counterclaims, which alleges that Plaintiffs tortuously interfered with GSG and ATI's business relationships in the course of the 2009 litigation. In order to prevail on a tortious interference claim, a claimant must establish the following: (1) the existence of a valid relationship; (2) the defendant's knowledge of the existence of the relationship; (3) the defendant's intentional interference with that relationship through some independent unlawful acts; (4) the absence of justification; and (5) damages resulting from defendant's wrongful interference with the relationship. *Meridian Fin. Advisors, Ltd. v. Pence,* 763 F. Supp. 2d 1046, 1063 (S.D. Ind. 2011). *See also Levee v. Beeching,* 729 N.E.2d 215, 222 (Ind. Ct. App. 2000) (citing *Bradley v. Hall,* 720 N.E.2d 737, 750 (Ind. Ct. App. 1999)).

Defendants assert that HK USA committed tortious interference by filing the 2009 lawsuit, maintaining it after it had surreptitiously assigned to HKG the MP5 intellectual property rights, and serving subpoenas on Defendants' business partners during the 2009 litigation. More specifically, they state that Orion Arms Corporation, an ATI customer, ceased making weapons purchases from ATI after Plaintiffs named it as a co-defendant with GSG and ATI in the 2009 lawsuit. Docket No. 330-9 (ATI's Third Supplemental Answers to Interrogatories) at 5. Defendants list a further 13 ATI customers who they assert reduced their business relationships with Defendants—or ceased them entirely—after Plaintiffs served them with subpoenas on

August 24, 2009, in connection with the 2009 litigation.[21] *Id.* at 6–7. According to ATI president DiChario, these subpoenas and the threat of subpoenas were driving forces behind ATI's decision to settle the 2009 litigation. Docket No. 118-1 (DiChario Decl.) at ¶ 8. Lastly, Defendants add an allegation that was not present in their original pleadings—that their relationship *with each other* was damaged by Plaintiffs' actions, since manufacturer GSG lost the ability to sell retailer ATI "its most profitable product line, the GSG-5 firearms," as a result of clauses in the Agreement. Docket No. 349 at 44–45. *See also* Docket No. 332 at 49.

As a preliminary matter, we note that damage to the relationship between GSG and ATI themselves is not a valid basis for a tortious interference with business relationship claim. Plaintiffs have designated evidence, uncontroverted by Defendants, that the relationship between GSG and ATI at the time of the settlement of the 2009 litigation was governed by a written "Exclusive Distribution Agreement" between them. Docket No. 347-11 (Exclusive Distribution Agreement)[22]; Docket No. 237-10 (Swoboda Dep.) at 159. As the Indiana Court of Appeals explained in *Murat Temple Association v. Live Nation Worldwide, Inc.*, 953 N.E.2d 1125 (Ind. Ct. App. 2011), "an action for intentional interference with a business relationship arises where there is no contract underlying the relationship." 953 N.E.2d at 1132 (citing *Levee v. Beeching*, 729 N.E.2d 215, 220 (Ind. Ct. App. 2000)). We therefore consider only Defendants' allegations relating to interference with their non-contractual business relationships. *Id.*

As to Defendants' cognizable claims for tortious interference, Plaintiffs advance four arguments for summary judgment: (1) that the counterclaim is barred by Indiana's litigation

---

[21] These subpoenas were thus served after the Assignment was executed, and allegedly consummated, in March 2009.

[22] Defendants have moved to seal this document, arguing that it contains confidential business information. Plaintiffs have cited it only to demonstrate the existence of the contractual relationship, and that is the only purpose for which the Court cites it now.

privilege, (2) that HK USA's actions in the 2009 Litigation were justified, (3) that HK USA committed no "independent unlawful acts," (4) that Defendants have failed to show damages. Docket No. 330 at 33–34. We reach only the first of these arguments.

We have already addressed, and rejected, Plaintiffs' general arguments for construing Indiana's litigation privilege to bar Defendants' counterclaims for fraud and deception. This counterclaim, however, is based on a different series of predicate acts: HK USA's filing and maintenance of the 2009 Litigation against GSG, ATI, and Orion and the serving of subpoenas on Defendants' other business partners in connection with that action. As such, the question of the litigation privilege warrants consideration anew.[23]

Plaintiffs contend that "Indiana has explicitly expanded the litigation privilege to preclude tortious-interference claims arising from statements in litigation." Docket No. 330 at 35 (citing *Estate of Mayer v. Lax, Inc.,* 998 N.E.2d 238, 249 (Ind. Ct. App. 2013)). In fact, they urge, Indiana courts have countenanced the expansion of the privilege in this context to apply to "statements in litigation even where the statements are not alleged to be defamatory. In other words, a statement is privileged against a tortious-interference claim simply if it is made in litigation." *Id.* at 36 (citing *Watson Rural Water Co. v. Ind. Cities Water Corp.,* 540 N.E.2d 131, 139 (Ind. Ct. App. 1989)). Defendants rest on their previous arguments, apparently confident that the reasoning that excluded Plaintiffs' alleged fraud and deception from the litigation privilege

---

[23] In contending that the litigation privilege does not apply to the tortious interference counterclaim, Defendants quote a statement we made in denying Plaintiffs' first motion to dismiss this count. In our Order of September 30, 2013, we said: "Since the 'more than two dozen lawsuits' initiated by HK USA are alleged to be in bad faith, the privilege for good-faith litigation . . . is no bar to their serving as the basis for a tortious interference claim." *Heckler & Koch, Inc., et al. v. German Sports Guns GmbH, et al.,* 976 F. Supp. 2d 1020, 1037 (S.D. Ind. 2013) (citing *Watson Rural Water Co. v. Ind. Cities Water Corp.,* 540 N.E.2d at 139). That language arose in our discussion of the "independent unlawful act" element of the tortious interference claim; we did not address the litigation privilege at all in that Order because the issue was not before us on the motion to dismiss. We used the word "privilege" in a more general, colloquial sense there—and as we discuss below, the holding of *Watson Rural* is fully consistent with the conclusion we reach with regard to the privilege here.

will suffice here. Defendants err in giving the issue such short shrift, for we conclude that the privilege does apply to the tortious interference claim, warranting summary judgment in favor of Plaintiffs.

The two recent Indiana cases cited by Plaintiffs lend weight to their argument. In *Estate of Mayer v. Lax, Inc.,* 998 N.E.2d 238 (Ind. Ct. App. 2013), a party brought claims for defamation, negligent supervision and retention, tortious interference with a business relationship, and tortious interference with a contract against its opponent in a prior action, on the grounds that the opponent had brought counterclaims in that action accusing it of conspiracy, bribery, racketeering, and other species of chicanery. 998 N.E.2d at 243–244, 249. Rejecting the argument that the absolute litigation privilege would bar *all* of the derivative claims, the court nevertheless agreed that the privilege could extend beyond the narrow bounds of defamation: "Other torts *related to defamation,* or relying upon defamatory statements as proof of wrongdoing," the court concluded, "may also be barred by the litigation privilege." *Id.* at 249 (emphasis added). Thus, the court applied the privilege to an action for tortious interference, reasoning that the statement upon which the claim was based was analogous to defamation. In *Watson Rural Water Co. v. Ind. Cities Water Corp.,* 540 N.E.2d 139 (Ind. Ct. App. 1989), the court held that a party's public statement of its contested litigation position was both an improper predicate act for tortious interference liability and shielded by the litigation privilege. 540 N.E.2d at 149. The court explained:

> In its counterclaim Watson essentially contends that Indiana Cities' public representations, that it, rather than Watson, had the right to provide water utility service to the hospital and other disputed areas, constituted interference with Watson's business relationships. Such representations made in good faith, simply do not constitute illegal acts sufficient to support a claim of tortious interference with a business relationship. *Furthermore*, insofar as Indiana Cities

38

> representations were made within the context of litigation, *such representations are privileged and will not serve as a basis for liability*.

*Id.* (citing *Briggs v. Clinton Cnty. Bank & Trust Co.,* 452 N.E.2d 989, 997 (Ind. Ct. App. 1983)) (emphasis added).

Here, Defendants allege that Plaintiffs maintained a baseless[24] lawsuit against them and Orion and subpoenaed a number of their business associates in connection with that suit—with the effect that at least some of those associates curtailed their dealings with Defendants. The gravamen of the claim is that HK USA publicly accused Defendants of infringing its trade dress rights when it lacked a sound basis for doing so; Defendants therefore allege, at least in part, a reputational injury. While this is not a defamation claim, in other words, it occupies the same conceptual neighborhood. *See Kelley v. Tanoos,* 865 N.E.2d 593, 596 (Ind. 2007) (noting that a communication is defamatory if it "tend[s] to harm a person's reputation by lowering the person in the community's estimation or deterring third persons from dealing or associating with the person") (quoting *Rambo v. Cohen,* 587 N.E.2d 140, 145 (Ind. Ct. App. 1992)).

There is also no doubt that HK USA's communications arose in the context of litigation and were pertinent to that litigation. *See Briggs,* 452 N.E.2d at 997 (noting that the "relevancy or pertinency" of a communication to litigation is a matter of law, and is to be construed liberally). "Lawsuits are not peace conferences. Feelings are often wounded and reputations are sometimes maligned." *Estate of Mayer,* 998 N.E.2d at 247. Forms of redress do exist for a party that has

---

[24] The counterclaim certainly differs from the typical defamation-type allegation in that the reason Defendants assert the suit to have been baseless was, at least in part, that HK USA lacked any enforceable rights in the trademark rather than Defendants were necessarily innocent of infringing the MP5 trade dress. While the truth or falsity of the communication at issue is, of course, a dispositive issue in a bona fide defamation claim, *see Ind. Nat'l Bank v. Chapman,* 482 N.E.2d 474 (Ind. Ct. App. 1985), we do not think the distinction is critical with respect to the applicability of the litigation privilege.

been injured by another's misuse of the litigation process; "not everything a lawyer files in court on behalf of a client is absolutely privileged from being the subject of a lawsuit by a third party." *Id.* at 250. *See also Briggs,* 452 N.E.2d at 998. Causes of action for malicious prosecution or abuse of process exist to fulfill this remedial purpose, and the Indiana courts, like those of other states, have recognized that it would be illogical to allow the litigation privilege to apply to claims of that type. *See Estate of Mayer,* 998 N.E.2d at 250 (Holding that malicious prosecution and abuse of privilege "causes of action are based on the malicious or abusive use of the judicial system and are not subject to an absolute privilege"); *Trotter v. Ind. Waste Sys., Inc.,* 632 N.E.2d 1159, 1164 (Ind. Ct. App. 1994) (applying privilege to bar a slander of title claim but not one for malicious prosecution). We conclude that Indiana's litigation privilege does, however, apply to bar the cause of action Defendants have asserted here.

There is significant conceptual overlap between the litigation privilege and the "lack of justification" element necessary to establish a tortious interference claim. Because we have interpreted Indiana case law in a manner that would bar tortious interference suits based on the filing of a lawsuit, we pause briefly to address a previous, unpublished decision of this Court that employed a different analytical approach. In support of their argument that the acts upon which their tortious interference counterclaim is based were unjustified, Defendants rely on *Square D Co. v. Breakers Unlimited, Inc.,* 2009 WL 1407017, *2 (S.D. Ind. May 19, 2009). There, as here, the court addressed a defendant's counterclaim that the filing of a lawsuit constituted tortious interference. Though admitting that Indiana precedent was not conclusive of the question, the *Square D* court held that the filing of a lawsuit—at least where not in bad faith—could never give rise to such a claim.

> While the Indiana Supreme Court has not spoken directly on this issue, this Court determines that the filing and/or prosecution of a legitimate—that is, not frivolous—lawsuit cannot form the basis of a tortious interference claim under Indiana law . . . . If a party has a legitimate legal claim against a competitor, the party is "justified" in pursuing that claim, even if by doing so it might interfere with its competitor's business relationships.

2009 WL 1407017, at *2. Relying on the negative implication of this language, Defendants insist that their tortious interference claim remains viable so long as a fact-finder could determine that HK USA's 2009 suit was in bad faith. Docket No. 349 at 46–47.

The court in *Square D* did not explicitly consider the applicability of the litigation privilege. In a footnote, however, it did ruminate on the possibility that a more categorical bar would apply to this type of suit:

> It is possible that if the Indiana Supreme Court considered the issue it might agree with Illinois's rule that "the only cause of action recognized for the wrongful filing of a lawsuit is one for malicious prosecution or abuse of process." *Havoco v. America, Ltd. v. Hollobow,* 702 F.3d 643, 647 (7th Cir.1983) [additional citation omitted]. This Court need not decide that question, however, because it is clear that a tortious interference claim cannot be maintained based upon the facts of record in this case.

Like the court in *Square D,* we see no need to venture a prediction as to whether the Indiana Supreme Court would opt to follow Illinois's rule, whatever policy strengths such a rule may have to recommend it. Based on our reading of the Indiana case law, however—particularly *Estate of Mayer,* which post-dated this court's opinion in *Square D*—we do conclude that the litigation bars tortious interference claims like those brought here and in *Square D,* regardless of whether the lawsuit giving rise to the claim was brought in good or bad faith.[25]

---

[25] *Watson Rural* is consistent with this reasoning as well. There, the court held that a tortious interference suit failed for two reasons: (1) the "representations" embodied in a party's litigation position, at least if they are made in good faith, do not constitute "unjustified" conduct, *and* (2) any such representations, if made in connection with litigation, are privileged. *See Watson Rural,* 540 N.E.2d at 139.

We therefore GRANT Plaintiffs' motion for summary judgment on Defendants' Counterclaim Count VII for tortious interference with business relationships, and DENY Defendants' motion for summary judgment on the same count.

**IV.    Breach of Contract Counterclaims**

Defendants assert in their counterclaims that Plaintiffs have breached the 2009 Agreement in a number of respects. They allege that Plaintiffs breached the Agreement's confidentiality clause (Counterclaim Count IV), its forum-selection clause (Counterclaim Count VI), and its covenant not to sue in connection with the GSG-522 firearms and alternative dispute resolution (ADR) provisions (Counterclaim Count V). Both parties seek summary judgment as to all of these counts.

**A. Counterclaim Count IV -- Breach of the Confidentiality Clause**

The 2009 Agreement contained a confidentiality clause providing that "[e]ach party agrees that the terms of this Agreement shall be maintained confidential and shall not be disclosed except for purposes of enforcement of the Agreement." Docket No. 45-1, ¶ 24. Defendants allege that Plaintiffs have violated that clause in two respects: (1) by attaching a copy of the Agreement to their Complaint in this suit, *see* Docket No. 251 at ¶ 76; and (2) and by emailing a copy of the final version of the Agreement to an executive with the company Umarex GmbH on two occasions shortly after the Agreement was concluded. *See* Docket No. 349 at 15, ¶¶ 11–12 (citing Docket No. 332, Exs. 4–5).

Defendants' claim that attaching the Agreement to Plaintiffs' complaint constituted breach of contract is foreclosed by the plain text of the confidentiality clause. Under Indiana law, settlement agreements "are governed by the same general principles of contract law as any other

agreement." *Zukerman v. Montgomery,* 945 N.E.2d 813, 819 (Ind. Ct. App. 2011). As with other contracts, then, the interpretation of the 2009 Settlement Agreement is a question of law for the Court. *See Motorists Mut. Ins. Co. v. Wrobleski,* 898 N.E.2d 1272, 1275 (Ind. Ct. App. 2009) (citing *Briles v. Wausau Ins. Cos.*, 858 N.E.2d 208, 213 (Ind. Ct. App. 2006)). "When construing a contract, unambiguous contractual language is conclusive upon the parties and the courts." *Niezer v. Todd Realty, Inc.*, 913 N.E.2d 211, 215 (Ind. Ct. App. 2009) (citing *Trustcorp Mortgage Co. v. Metro Mortgage Co., Inc.*, 867 N.E.2d 203, 212 (Ind. Ct. App. 2007)). "If an instrument's language is unambiguous, the parties' intent is determined from the four corners of the instrument." *Id.* The confidentiality clause here prohibits disclosure of the Agreement except "for purposes of enforcement." Docket No. 45-1 at ¶ 24. We can think of no clearer fit to this exception than attaching the Agreement to a complaint alleging its breach.[26] Both Seventh Circuit precedent and the Indiana Trial Rules command that the text of a written instrument be disclosed when initiating litigation of which the document is the subject. *See Herrnreiter v. Chi. Hous. Auth.*, 281 F.3d 634, 637 (7th Cir. 2002) ("Now that the agreement itself has become a subject of litigation, it must be opened to the public just like other information that becomes the subject of litigation.") (internal parentheticals omitted); Ind. Trial Rule 9.2(A) ("When any pleading allowed by these rules is founded on a written instrument, the original, or a copy thereof, must be included in or filed with the pleading."). Plaintiffs' attachment of the Agreement to their complaint was both proper and expressly permitted by the Agreement's confidentiality clause.[27]

---

[26] Plaintiffs' initial complaint in state court alleged only breach of contract; the Amended Complaint added the intellectual property claims. *See* Docket No. 1, Ex. A (Complaint as removed from state court); Docket No. 45 (Amended Complaint).

[27] Defendants assert that Plaintiffs could have filed the Agreement under seal, disclosed only limited parts of the Agreement, or declined to disclose it entirely, relying on courts' discretion to allow litigation to proceed despite a technical rules violation under Trial Rule 9.2F. These proffered alternative courses of action miss the point:

Summary judgment against Defendants is also warranted on their allegation that Plaintiffs violated the confidentiality clause by attaching a copy of the Agreement to emails sent to a Umarex GmbH executive. While Plaintiffs appear to concede that this constituted a violation of the clause, Docket No. 332-6 (Ihloff Dep.) at 296–297,[28] Defendants have failed to show any damages flowing from the alleged breach. Under Indiana law, a party claiming breach of contract bears the burden of pleading and proving damages: "A mere showing of a breach of contract does not necessarily entitle a plaintiff to damages." *Lincoln Nat'l Life Ins. Co. v. NCR Corp.*, 772 F.2d 315, 320 (7th Cir. 1985). Damages may not be awarded on the basis of "guess or speculation." *Dana Companies, LLC v. Chaffee Rentals,* 1 N.E.3d 738, 748 (Ind. Ct. App. 2013); *Sammons Commc'ns of Ind., Inc. v. Larco Cable Constr.*, 691 N.E.2d 496, 498 (Ind. Ct. App. 1998). Rather, "a plaintiff must have adequate evidence to allow a jury to determine with sufficient certainty that damages in fact occurred, and, if so, to quantify such damages with some degree of precision." *Shepard v. State Auto. Mut. Ins. Co.*, 463 F.3d 742, 745 (7th Cir. 2006) (citing *Fowler v. Campbell,* 612 N.E.2d 596, 603 (Ind. Ct. App. 1993)) (further citations omitted).

The only evidence of damages upon which Defendants rely falls short of this standard. In his deposition testimony, ATI president DiChario contended that disclosure of the Agreement was harmful to his company. He stated:

> Paying $300,000 [in the Agreement], it could be construed as an admission of guilt by our customers, by our fans, as an admission – or making us look like we're just not good business people. People can take things out of context and

---

Plaintiffs' conduct did not violate the confidentiality clause, and the possibility that the court would have let them get away with less disclosure is immaterial.

[28] While HKG managing director Ihloff did not explicitly state that this action violated the confidentiality clause, Defendants reasonably construe his concession that the Agreement had not been "performed perfectly" as a tacit admission. Docket No. 349 at 15. Plaintiffs do not argue that there was not a technical breach, instead focusing their arguments as to this point on the lack of evidence of damages.

make anything they want with it. It's certainly not the nicest thing to wear around your neck.

Docket No. 332-7 (DiChario Dep.) at 205. This statement is not "evidence" of damages from the email disclosures, for two chief reasons. First, DiChario's comments were in response to a question about the *filing* of the Agreement as an attachment to the complaint—an act that, as we have already determined, did not breach the confidentiality clause at all. Second, his assertions that the disclosed Agreement "*could* be construed as an admission of guilt" and "[it's] certainly not the nicest thing to wear around your neck" do not state specifically that any damages occurred—still less do they provide evidence of any ascertainable type or quantity of monetary harm. *Cf. Shepard,* 463 F.3d at 745 (noting that the amount of damages claimed must be "referenced to some fairly defined standard"). The purely conjectural nature of DiChario's opinion was revealed in a deposition colloquy that took place immediately after the portion excerpted by Defendants:

> Q: Have you lost a single sale as the result of the Settlement Agreement being put on public record?
> A: No idea. I can't answer that. I haven't even looked at that.

DiChario Dep. at 205.

In support of their motion for summary judgment, Plaintiffs also refer us to the testimony of GSG president Swoboda, a German-speaker who was deposed in the company of an interpreter.[29] After telling the interpreter (in German) that the purported breach of confidentiality "had no effect on me," Swoboda then declined to answer the damages question on the advice of

---

[29] The parties engage in an acrimonious debate about whether the conduct of Swoboda's interpreter, who was also an attorney, was proper. Because we do not view Swoboda's testimony on this issue as supporting any inferences in Defendants' favor, we need not wade into that issue.

counsel. Docket No. 330-7 (Swoboda Dep.) at 310; Docket No. 330-8 (Stephens Decl.) at ¶ 6.[30] While Defendants may be correct that this muddled non-testimony does not conclusively establish that GSG was *not* damaged, Swoboda's failure to answer the question does nothing to help Defendants meet their evidentiary burden here.

The principal offense of which Defendants complained was no breach at all, and Defendants have failed to show that any breach that did occur produced damages.[31] *See Dana Companies,* 1 N.E.3d at 748–749. Accordingly, we GRANT Plaintiffs' motion for summary judgment on Counterclaim Count IV for breach of the 2009 Agreement's confidentiality clause, and DENY Defendants' motion for summary judgment on the same count.

## B. Counterclaim Count VI – Breach of the Agreement's Forum-Selection Clause

The Agreement's forum-selection clause states: "The parties agree that the United States District Court for the Southern District of Indiana shall retain jurisdiction to enforce this Agreement." Docket No. 45-1 at ¶ 8. Arguing that this clause is mandatory—requiring that any dispute arising from the Agreement be adjudicated in the Southern District—Defendants contend that Plaintiffs' initial filing of the current suit in Indiana state court therefore constituted a breach. Docket No. 349 at 51. We conclude that the forum-selection clause is not mandatory, and thus not enforceable.

---

[30] The "Stephens Declaration" is a sworn statement by Taft Stettinius & Hollister attorney Connie Stephens, a German-speaker who reviewed the videotaped Swoboda testimony and transcribed Swoboda's conversation in German with his attorney/translator. Docket No. 330-8.

[31] Defendants argue in their brief, without any citation to evidence other than the aforementioned DiChario deposition, that their injury was in being "deprived of the benefit of their bargain." Docket No. 349 at 48. "Such a breach is actionable," they assert, citing *Gulliver Sch., Inc. v. Snay,* 137 So.3d 1045 (Fla. Dist. Ct. App. 2014). The Florida case they cite says nothing about the issue of damages; while there is no doubt that a material breach of contract depriving a party of the benefit of its bargain may be "actionable," the element of their cause of action Defendants have failed to establish here is not actionability in the abstract, but damages from this particular alleged breach.

A mandatory forum-selection clause is "one that contains clear language showing that jurisdiction is appropriate only in the designated forum." *Duggan O'Rourke, Inc. v. Intelligent Office Sys., LLC,* 2012 WL 4057215, at *2 (S.D. Ind. Sept. 14, 2012). Clauses that do not contain mandatory language are only permissive and not enforceable. "The law is clear: where venue is specified with mandatory or obligatory language, the clause will be enforced; where only jurisdiction is specified, the clause will generally not be enforced unless there is some further language indicating the parties' intent to make venue exclusive." *Paper Exp., Ltd. v. Pfankuch Maschinen GmbH,* 972 F.2d 753, 757 (7th Cir. 1992) (citing *Docksider, Ltd. v. Sea Technology, Ltd.,* 875 F.2d 762, 763–764 (9th Cir. 1989)).

Defendants insist that since the clause uses "'the mandatory language of *shall*' and not the 'permissive language *may*,'" its language should be read as mandatory. Docket No. 349 at 51 (citing *Indep. Stationers, Inc. v. Vaughn,* 2000 WL 1449854, *8 n.7 (S.D. Ind. Jan. 3, 2000); *Paper Exp.*, 972 F.2d at 756) (emphasis added). But the use of the word "shall" in forum-selection clauses is no shibboleth. In the cases Defendants cite, the mandatory intent of the contractual language was evident not on the basis of a single word, but the totality of the parties' statement. In *Independent Stationers, Inc. v. Vaughn,* 2000 WL 1449854 (S.D. Ind. Jan. 3, 2000), for instance, the court read a forum-selection clause specifying that "any action to enforce this Agreement . . . *may* be brought in the courts of Indiana" as merely permissive; it noted, however, that a clause using the same language, but with the phrase "*shall* be brought" instead, would have been mandatory. 2000 WL 1449854, at *8 n.7. In *Paper Express Ltd. v. Pfankuch Maschinen GmbH,* 972 F.2d 753 (7th Cir. 1992), the Seventh Circuit interpreted a clause providing that "[i]n all disputes arising out of the contractual relationship, the action shall be filed in the court which has jurisdiction for the principal place of business of the supplier." 972 F.2d at 755. The court

determined that the language "*all* disputes . . . *shall* be filed" left no doubt about the mandatory nature of the provision. *Id.* at 756.

At the same time, however, a clause merely specifying that a certain court possesses jurisdiction, even if it uses the word "shall," is permissive unless it clearly expresses the exclusive nature of the grant. *See, e.g., Pioneer Life Ins. Co. of Ill. v. Anderson,* 1988 WL 143726, at *1 (N.D. Ill. Dec. 21, 1988) (interpreting a clause stating "Winnebago County, Illinois shall be the place of jurisdiction" as permissive); *Hunt Wesson Foods, Inc. v. Supreme Oil Co.*, 817 F.2d 75, 77–78 (9th Cir. 1987) (ruling that a clause providing that a certain California court "shall have jurisdiction" over contract disputes was permissive, not mandatory). Here, the most natural reading of the Agreement's forum-selection clause—stating that the Southern District shall *retain* jurisdiction—is that it grants jurisdiction to this Court, but in a non-exclusive fashion. We read the clause as similar to one addressed by the Northern District of Indiana in *Parker v. Hostetler,* 2008 WL 346007 (N.D. Ind. Feb. 6, 2008). There, the contract provided that "[t]he parties . . . agree to submit to the personal jurisdiction and venue of a court of subject matter jurisdiction located in the County in which the property sits." 2008 WL 346007, at *3. Finding that the clause was not "ambiguous, confusing, or vague," the court reasoned that it "contain[ed] no mandatory language indicating the parties' intent to make venue exclusive." *Id.* (distinguishing *Paper Express*). *Cf. Muzumdar v. Wellness Int'l Network, Ltd.*, 438 F.3d 759, 761–762 (7th Cir. 2006) (holding that a clause had exclusive intent where it stated that actions "shall be filed *only*" in a certain court). As in *Parker,* though we believe the Agreement's forum-selection clause clearly signals that this court is a proper forum for any dispute that might arise between the signatories, in the absence of any language manifesting the parties' intent to rule out other jurisdictions, we cannot construe it as mandatory.

We therefore GRANT Plaintiffs' motion for summary judgment on Counterclaim Count VI for breach of the 2009 Agreement's forum-selection clause, and DENY Defendants' motion for summary judgment on the same count.

## C. Counterclaim Count V – Breach of ADR and Covenant Not to Sue Provisions

Defendants' Counterclaim Count V alleges that Plaintiffs violated two related provisions of the 2009 Agreement by filing the current suit. Both parties seek summary judgment as to both aspects of this counterclaim. Because Plaintiffs never raise the issue of damages, however, we construe Defendants' motion on this Count as a partial motion for summary judgment on the question of breach only.[32]

### 1. Paragraph 14 – ADR Provision and Covenant Not to Sue ATI

The Agreement provides an alternate dispute resolution (ADR) process that applies to future trade dress infringement disputes between Plaintiffs and ATI. The provision states as follows:

> *Covenant Not to Sue ATI and Liquidated Damages.* In the event HK becomes aware of any products being sold by ATI that HK believes infringes [sic] upon the claimed HK MP5 trade dress or the trade dress of the HK G3 ("Alleged Infringing Products"), HK shall give written notice ("Written Notice") to ATI. HK and ATI shall meet within ten (10) working days of the submission of the Written Notice to discuss the matter in good faith. ATI will have the option of either: (1) ceasing sales of the Alleged Infringing Products; or (2) identifying the supplier of the Alleged Infringing Products (the "Supplier"). If ATI elects either option, HK covenants not to sue ATI or any of ATI's customers or distributors for any intellectual property claim, remedy, damage or right it has or may have against ATI or any customers or distributors of ATI for the sale by any of them of the Alleged Infringing Products. . . .

---

[32] The amount of damages if a breach is proven is, of course, an issue for the jury, but Plaintiffs could have argued, as they did in connection with the confidentiality clause, that no facts in the record could warrant a reasonable juror to infer that damages existed in some ascertainable amount.

Docket No. 45-1 ¶ 14. It is undisputed that Plaintiffs did not engage in this prescribed ADR procedure before filing the current suit. *See* Docket No. 349 at 20, ¶ 50 (citing Docket No. 332-11 at ¶ 8a).

Plaintiffs argue that initiating this litigation without following the notice and ADR procedures did not constitute a breach of the Agreement, because the clause applies narrowly to claims against ATI for trade dress infringement. Docket No. 330 at 41–42. The provision was not implicated, they contend, because their initial complaint against both ATI and GSG stated only a contract claim (not trade dress infringement) and their Amended Complaint—which does contain trade dress infringement claims—names only GSG as a Defendant. *Id.* While Plaintiffs' reading of the clause is a bit too narrow, we agree that it does not apply to bar a suit against GSG. It true that the Agreement's ADR requirements are triggered only when HK identifies an infringing product sold by ATI. Docket No. 45-1 at ¶ 14. And indeed, Plaintiffs' Amended Complaint asserts that ATI, along with GSG, is engaged in the sale of weapons infringing Plaintiffs' trademark and trade dress rights. *See* Docket No. 45 at ¶ 3 ("GSG and ATI's advertisement, manufacture and/or sale of the GSG-5 and the 522s violates HK's rights under federal trademark law."). The resulting covenant not to sue applies not only to ATI, but to "any of ATI's customers or distributors,"[33] Docket No. 45-1 at ¶ 14, and Plaintiffs *have* sued GSG for trade dress infringement, *see* Docket No. 45. However, it appears from Defendants' own statements that ATI is itself a customer of GSG, selling in the United States the weapons that GSG manufactures. *See* Docket No. 349 at 44–45. Moreover, it would be illogical in the context of the

---

[33] In granting Plaintiffs' motion for leave to amend their complaint in 2012, we observed that "the dispute resolution provision only applies to ATI." Docket No. 44 at 4. That characterization was accurate enough for purposes of rejecting Defendants' Rule 12 futility argument, but it was something of an oversimplification. The important point on the motion to dismiss—and here—is that the clause does not implicate GSG.

Agreement—of which GSG was also a signatory—to refer to ATI's customers and distributors in the abstract if GSG itself fits that description. Because there is no reason to believe that a suit against GSG for trade dress infringement is subject to paragraph 14 of the Agreement, and because Plaintiffs have not named ATI as a Defendant in any of their infringement claims, we conclude that Plaintiffs have not breached the Agreement in this respect.

Accordingly, we GRANT Plaintiffs' motion for summary judgment on Defendants' Counterclaim Count V with respect to paragraph 14 of the Agreement, and we DENY Defendants' motion for summary as to that portion of that count.

## 2.  Paragraph 5 – The GSG-522 firearms

Defendants also allege that Plaintiffs have breached paragraph 5 of the Agreement, which reads as follows:

> *GSG-522 Firearms.* HK has reviewed the design of the GSG-522 attached hereto as Exhibit "A" (the "GSG-522 Firearm") and covenants not to sue GSG or any of its customers, distributors, dealers or importers for its sale in the United States or anywhere in the world, provided GSG otherwise complies with this Agreement. This covenant extends to airsoft guns in the design of the GSG-522 Firearm.

Docket No. 45-1 at ¶ 5. Defendants contend that Plaintiffs ignored this restriction, filing a "baseless" breach of contract suit against GSG and ATI in their original complaint. Docket No. 349 at 51. Plaintiffs retort that the Agreement's covenant not to sue applies only if GSG sells weapons conforming to the design approved by the parties in 2009; according to Plaintiffs, their current suit is based in part on Defendants' retailing of weapons that are labeled "GSG-522" but which do not conform to the approved design.

The question whether the GSG-522 as it is currently sold differs materially from the GSG-522 as described by the parties in Exhibit A to the Agreement is one of fact. Plaintiffs

contend that the GSG-522 has been altered from the approved design to include an "MP5-style" stock, foregrip, and rifle barrel, *see* Docket No. 346 at 7–8 (citing Docket No. 347-7, Sealed Ex. 16), while Defendants assert that "each and every design element" between the approved GSG-522 and the allegedly infringing one is the same. *See* Docket No. 349 at 20, ¶ 48 (citing Docket No. 1, Ex. A). The factual issue presented by this breach claim is intertwined with the factual issues which, as we discuss below, prevent summary judgment on Plaintiffs' trade dress infringement claims.

We therefore DENY both Plaintiffs' and Defendants' motions for summary judgment on Defendants' Counterclaim Count V for breach of contract with respect to paragraph 5 of the Agreement.

## V.      Counterclaim Counts VIII and IX -- Cancellation of Trademark under 15 U.S.C. § 1119 and Damages under 15 U.S.C. § 1120

Defendants seek cancellation of the MP5 trademark, U.S. Trademark Reg. No. 1,594,109, on the grounds that HK USA's "Combined Declaration of Use/Application for Renewal of Registration" under Sections 8 and 9 of the Lanham Act ("the Section 8/9 Application") contained fraudulent statements to the PTO. They also seek damages on the theory that they have incurred the expenses of this lawsuit as a consequence of the registration's procurement by fraudulent means. *See* Docket No. 215 at ¶¶ 97–106. We conclude that any misrepresentations made by HK USA were not material to the Section 8/9 Application and thus do meet the high standards necessary for trademark cancellation on the basis of fraud.

The Lanham Act provides: "In any action involving a registered mark the court may determine the right to registration, order the cancelation of registrations, in whole or in part,

restore canceled registrations, and otherwise rectify the register with respect to the registrations of any party to the action." 15 U.S.C. § 1119. Fraud in procuring a trademark registration or, as Defendants allege here, in renewing the registration under Sections 8 and 9, is a potential basis for cancelation by the Court. *See In re Bose Corp.*, 580 F.3d 1240, 1243 (Fed. Cir. 2009). A party seeking cancelation, however, faces a formidable burden of proof with respect to both the persuasiveness of the evidence and the showing of fraudulent intent on the part of the registrant. *See Money Store v. Harriscorp Fin., Inc.,* 689 F.2d 666, 670–671 (7th Cir. 1982); *W.D. Byron & Sons, Inc. v. Stein Bros. Mfg. Co.*, 377 F.2d 1001, 1004 (Fed. Cir. 1967); *Donovan v. Bishop,* 2011 WL 1560991, at *3 (S.D. Ind. Apr. 21, 2011). In order to prevail on their counterclaim, then, Defendants must show by "clear and convincing evidence" that HK USA's misstatements to the PTO were "(1) made with the *knowledge* of their falsity, and (2) *material* to the determination to grant the application." *Oreck Corp. v. Thomson Consumer Elecs., Inc.*, 796 F. Supp. 1152, 1159 (S.D. Ind. 1992) (quoting *Marshak v. Sheppard,* 666 F. Supp. 590, 598 (S.D.N.Y. 1987)) (emphasis original). "There is no room for speculation, inference or surmise and, obviously, any doubt must be resolved against the charging party." *In re Bose,* 580 F.3d at 1243.

HK USA's allegedly fraudulent conduct here consisted of filing the Section 8/9 Application with the PTO on March 17, 2010—representing in its communication to the PTO that it remained the "owner" of the registered MP5 trademark. Docket No. 332-15 (Defs.' Ex. N). As we have already discussed, *see supra* § I(B), there is at least a genuine issue of fact as to whether HK USA's claim to own the mark as of March 2010 was false. Defendants' theory that the misrepresentation was made with the requisite scienter hangs from a thin evidentiary thread, but we can also assume for purposes of this motion that HK USA president Weber knew the

statement was incorrect when he submitted the Application on the company's behalf. *See* Defs.' Ex. A (Weber Dep.) at 51–52 (Weber's testimony that he understood the Assignment to transfer the MP5 rights to HKG).[34] Defendants cannot succeed, however, in showing that the misrepresentation was material to the PTO's consideration of their declaration of continued use and application for renewal.

In order to cancel a trademark registration on grounds of fraud, the charging party must show that a misrepresentation to the PTO was "material to the determination to grant the application"—in other words, one that "would have affected the PTO's action on the applications." *Halo Mgmt., LLC v. Interland, Inc.*, 308 F. Supp. 2d 1019, 1031 (N.D. Cal. 2003) (quoting *Orient Express Trading Co. v. Federated Dep't Stores, Inc.*, 842 F.2d 650, 653 (2d Cir. 1988)); *Oreck,* 796 F. Supp. at 1159. In neither section of the Lanham Act under which HK USA filed its joint Application is the identity of the current owner of the mark dispositive to the PTO's grant or denial of the application. Section 9 of the Lanham Act, 15 U.S.C. § 1059, prescribes the procedure for renewal of registrations after 10-year intervals: "[E]ach registration may be renewed for periods of 10 years at the end of each successive 10-year period following the date of registration upon payment of the prescribed fee and the filing of a written application, in such form as may be prescribed by the Director." 15 U.S.C. § 1059(a). The relevant section of the PTO's Trademark Manual of Registration Procedure (TMEP), a document elaborating on the agency's evaluating criteria, specifies that "[t]he Trademark Act and the Trademark Rules of Practice do not require that a renewal application be filed by the owner of the registration.

---

[34] In their motion for summary judgment, Defendants argue that a jury could infer, primarily from the statements of HKG managing director Ihloff, that ample motive for deception existed for HK USA and HKG—namely, HKG's desire to avoid being drawn into U.S. litigation, and the companies' desire to meet the April 2010 deadline for registration renewal. *See* Docket No. 332 at 43 (citing Defs.' Ex. F (Ihloff Dep.) at 274, 281–282).

Therefore, if the renewal applicant is not the owner of record, the USPTO does not require that the renewal applicant show continuity of title from the original registrant." Trademark Manual of Registration Procedure § 1606.06 (Oct. 2014).

The Section 8 affidavit, with which a Section 9 affidavit is typically combined, avers that the trademark in question has been in continuous use on the registered goods or services since the date of registration. 15 U.S.C. § 1058. Unlike Section 9, Section 8 does require the affidavit to be filed by "the owner." *Id.* However, the Act provides specifically that "[i]f any submission filed within the time period set forth in subsection (a) is deficient, including that the affidavit was not filed in the name of the owner of the registration, the deficiency may be corrected after the statutory time period, within the time prescribed after notification of the deficiency." *Id.* at § 1058(c).

As Plaintiffs point out, the PTO has issued neither HK entity a notice of deficiency with respect to their Section 8 declaration, and if it had, the Act provides that HKG would have an opportunity to rectify the error before the MP5 trademark would be endangered. As the statutory language indicates, the primary purpose of declarations under Sections 8 and 9 is "to remove from the register automatically marks which are no longer in use." *In re Bose,* 580 F.3d at 1246 (quoting *Torres v. Cantine Torresella S.r.l.*, 808 F.2d 46, 48 (Fed. Cir. 1986)). In light of that overriding purpose—and the Act's provision of an express remedy for incorrect statement of ownership that stops short of denying the application for renewal—we see no indication that the misrepresentation at issue here was material to the PTO's review.[35] *See Artcraft Novelties Corp.*

---

[35] Defendants point to the expert testimony of Kenneth Germain that "it could not have been the PTO's intent to allow a deficiency known only to the owner but not to the PTO (i.e., because the owner had assigned away its rights before filing the Section 8) to go uncured *forever* without affecting the validity of the registration." Ex. E at 6, ¶ 14(b). The materiality of a misrepresentation to the PTO, however, is a question of law for the Court—a question of

*v. Baxter Lane Co. of Amarillo,* 685 F.2d 988, 992 (5th Cir. 1982) (determining that a Section 8 declaration's misstatement of ownership was not material "in light of the circumstances— namely, that [defendant] owned the mark when it was registered, but subsequently transferred the mark to his closely held, family corporation").[36]

Our determination that HK USA's alleged misrepresentation was not material, and thus did not constitute a fraudulent application for renewal, forecloses not only Defendants' counterclaim for cancelation under 15 U.S.C. § 1119, but also Defendants' counterclaim for resulting damages under 15 U.S.C. § 1120. In order to recover under the Act's "civil liability" provision, of course, a claimant must prove the underlying fraud on the PTO as well as its own entitlement to damages. *See Gilbert/Robinson, Inc. v. Carrie Beverage-Missouri, Inc.*, 989 F.2d 985, 992–993 (8th Cir. 1993), *abrogated on different grounds by Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377 (2014); *King-Size, Inc. v. Frank's King Size Clothes, Inc.*, 547 F. Supp. 1138, 1167 (S.D. Tex. 1982). Plaintiffs are therefore entitled to summary judgment on both the cancelation claim and the damages claim.

Accordingly, we GRANT Plaintiffs' motion for summary judgment on Counterclaim Counts VIII and IX, and DENY Defendants' motion for summary judgment on the same counts.

## VI.    Counterclaim Count XI – Lack of Trade Dress in Design of MP5 Firearms

Section 43(a) of the Lanham Act provides a cause of action against the unauthorized use by any person of "any word, term, name, symbol, or device, or any combination thereof . . .

---

which Germain's opinion is not probative. *See Gilbert/Robinson, Inc. v. Carrie Beverage-Missouri, Inc.*, 989 F.2d 985, 992–993 (8th Cir. 1993).

[36] *Artcraft* was decided under an earlier version of Section 8 that more expressly allowed successors and assigns to file, but we nonetheless agree with the court's reasoning that a misstatement as to ownership is not material—even if the current version of Section 8 does make it a formal violation subject to the remedy provided in subsection (c).

which . . . is likely to cause confusion . . . as to the origin, sponsorship, or approval of his or her

goods." 15 U.S.C. § 1125(a). Both the courts and Congress have long since recognized that

Section 43(a) may apply to protect the design of a product when the resulting appearance is used

to identify the product—the "trade dress"—as well as proprietary names or symbols. *See* 15

U.S.C. § 1125(a)(3) (describing cause of action for "trade dress infringement"); *Wal-Mart*

*Stores, Inc. v. Samara Bros., Inc.*, 529 U.S. 205, 210 (2000); *Publ'ns Int'l, Ltd. v. Landoll,* 164

F.3d 337, 338 (7th Cir. 1998). In order to be protectable under Section 43(a), a claimed trade

dress must be both *distinctive* and *nonfunctional.*[37] *See Al-Site Corp. v. VSI Int'l, Inc.,* 174 F.3d

1308, 1326 (Fed. Cir. 1999); *Abercrombie & Fitch Stores, Inc. v. American Eagle Outfitters,*

*Inc.*, 280 F.3d 619, 629 (6th Cir. 2002) (citing *Wal-Mart Stores,* 529 U.S. at 210). A successful

showing of distinctiveness, in turn, has two prerequisites. First, the party seeking protection must

establish that the putative trade dress is identifiable—that it is pitched at the proper level of

generality and describes a concrete design rather than a vague amalgamation of ideas. *See Jeffrey*

*Milstein, Inc. v. Greger, Lawlor, Roth, Inc.*, 58 F.3d 27, 32 (2d Cir. 1995); *Weber-Stephen Prods.*

*LLC v. Sears Holding Corp.*, 2013 WL 5782433, at *3 (N.D. Ill. Oct. 25, 2013). Second, a

plaintiff must show that the trade dress has acquired "secondary meaning." *Wal-Mart Stores,* 529

U.S. at 215.[38]

Defendants seek a declaratory judgment that Plaintiffs' claimed trade dress in the design

of the MP5 family of firearms is not protectable, and their argument rests on four grounds: (1)

the claimed trade is insufficiently identifiable, in that Plaintiffs' descriptions of it are "generic,

---

[37] In order to prevail on an infringement claim under Section 43(a), a plaintiff must show additionally that the trade dress of the competing good is confusingly similar to the protected trade dress. *Abercrombie & Fitch Stores,* 280 F.3d at 629.

[38] A trademark may also be "inherently distinctive," but the Supreme Court in *Wal-Mart Stores* held that, as to trade dress protection, "a product's design is distinctive, and therefore protectible [sic] only upon a showing of secondary meaning." 529 U.S. at 215.

unspecific, and inconsistent"; (2) the design in question is functional and thus not entitled to protection; (3) the claimed trade dress has not acquired the necessary "secondary meaning"; and (4) Plaintiffs have abandoned the claimed trade dress, forfeiting any rights they may have to it. Docket No. 32 at 52–70.

## A. The Kokalis Expert Report

We address these arguments in turn, but we first pause to address Defendants' objections to the admissibility of the expert report of Peter J. Kokalis, which Plaintiffs have designated in support of the protectability of their trade dress. Docket No. 346-8.[39] Defendants' first objection to the report is that it was untimely filed, because it missed the standard Case Management Plan's requirement that expert testimony to be used on summary judgment be disclosed no later than 60 days before the dispositive motion deadline. *See* Docket No. 364 at 10–11 (citing Docket No. 23 (Case Management Plan) at ¶ III(F)). As Plaintiffs point out, however, a number of decisions in this district have determined this Case Management Plan language does not apply to expert testimony designated by the non-moving party in response to a summary judgment motion. As Judge Magnus-Stinson reasoned in similar circumstances:

> [I]t is typically unworkable to require the non-moving party to anticipate the grounds on which its opponent may move for summary judgment and whether it will utilize expert testimony in response to the motion. The expert disclosure deadline occurs after the dispositive motions deadline in a typical case management plan, and if a party does not anticipate using expert testimony to move for summary judgment, it should not be required to disclose expert testimony sixty days prior to the dispositive motion deadline.

---

[39] Defendants also object to the expert report of Jeffrey M. Samuels, Docket No. 346-13. We need not address the objections to the Samuels report, whose contents have not proved material to our disposition of any of the motions before us. Defendants' objection based on the untimeliness of the report, however, is unfounded for the same reasons discussed in connection with the Kokalis report.

*Dugdale, Inc. v. Alcatel-Lucent USA, Inc.*, 2011 WL 2261318, at *3 (S.D. Ind. June 7, 2011). *See also Paul Harris Stores, Inc. v. PricewaterhouseCoopers, LLP*, 2006 WL 2644935, at *3–4 (S.D. Ind. Sept. 14, 2006). *But see Pond v. Bd. of Trustees, Ball State Univ.*, 2004 WL 2538645, at *2 (S.D. Ind. Sept. 9, 2004). We agree here with the court's reasoning in *Dugdale.* Plaintiffs have not sought summary judgment on their Lanham Act claims, and they have offered Kokalis's testimony only in response to Defendants' motion on those claims. Since they complied with the amended Case Management Plan's relevant deadline for disclosure of expert testimony, we will not strike the testimony on untimeliness grounds. *See* Docket No. 281 at 2.

Defendants also argue that the Kokalis report should be set aside because it fails to comply with Federal Rule of Evidence 702 and the *Daubert* standard. Courts employ a three-part analysis in determining whether expert witness testimony is relevant and reliable: "[1] the witness must be qualified as an expert by knowledge, skill, experience, training, or education; [2] the expert's reasoning or methodology underlying the testimony must be scientifically reliable; and [3] the testimony must assist the trier of fact to understand the evidence or to determine a fact in issue." *Ervin v. Johnson & Johnson, Inc.*, 492 F.3d 901, 904 (7th Cir. 2007) (quoting *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 592–593 (1993)) (additional citations omitted). Thus, "[i]t is not the trial court's role to decide whether an expert's opinion is correct. The trial court is limited to determining whether expert testimony is pertinent to an issue in the case and whether the methodology underlying that testimony is sound." *Smith v. Ford Motor Co.,* 215 F.3d 713, 719 (7th Cir. 2005).

Plaintiffs rely on Kokalis's report primarily on the issues of functionality and secondary meaning. Applying the first prong of the *Daubert* analysis, Defendants assert that Kokalis is unqualified to testify to such questions. "While Kokalis may be knowledgeable about the proper

*use* of firearms, he lacks the qualifications for which his report is presented, namely the creation and design of MP5 firearms and the marketplace perception of MP5 firearms." Docket No. 364 at 13. We find this objection to be misguided. Kokalis's report includes an extensive description of his credentials as an expert on firearms, a consultant to a number of national armed forces, and a published commentator in the field. Docket No. 346-10 at ¶¶ 2–10. Kokalis concedes that he is not a firearm design engineer, but his *curriculum vitae* renders him fit to offer opinion on the design of weapons from a user's perspective and on the place of the MP5 design in the marketplace. *Id.* at ¶ 11. In support of the notion that Kokalis is unqualified to offer expert testimony on consumer perceptions of the MP5, Defendants cite *Sassafras Enterprises, Inc. v. Roscho,* 915 F. Supp. 1 (N.D. Ill. Feb. 2, 1996), a decision in which the court stated that an expert could not speak to the "mental reactions that other persons would have," the "basis for his expression of other people's views," or whether consumers "desire the product with the particular feature because it signifies that producer." 915 F. Supp. at 8. But the context of *Sassafras* renders it readily distinguishable, and actually helps illustrate that relative strength of Kokalis's qualifications here. In that case, a plaintiff had failed to offer any evidence as to secondary meaning other than the affidavit of its sales representative, who offered the bare assertion that customers associated a product's look with the plaintiff. *Id.* Regardless of whether the affiant was qualified as an expert, the court concluded that the testimony was conclusory and speculative. Here, Kokalis is not simply presenting his *ipse dixit*; rather, he discusses facts about the MP5's place in the market that, according to Plaintiffs, enable a fact-finder to infer that it has

acquired secondary meaning. *See, e.g., id.* at ¶¶ 20–23. Kokalis is not qualified as a mind-reader, but neither is any other expert testifying to secondary meaning.[40]

As to the second *Daubert* factor, Defendants assert Kokalis has failed to identify any scientific "reasoning or methodology" underlying his testimony. Docket No. 364 at 14. Undoubtedly, Kokalis does not derive his opinions on the non-functionality or distinctiveness of the MP5 from any scientific methodology—nor does he claim to. Rather, he claims to derive his opinion from his "knowledge, training, experience, skill, and education" as applied to his review of the facts of this case and an extensive review of the features of the MP5 in comparison to other guns of similar type available on the market.[41] *See* Docket No. 346-8 at ¶¶ 19, 22–78. "The measure of intellectual rigor will vary by the field of expertise and the way of demonstrating expertise will also vary." *United States v. Conn,* 297 F.3d 548, 556 (7th Cir. 2002) (quoting *Tyus v. Urban Search Mgmt.*, 102 F.3d 256, 263 (7th Cir. 1996)). "In certain fields, experience is the predominant, if not the sole, basis for a great deal of reliable expert testimony." *Id.* (citing Fed. R. Evid. 702, 2000 advisory committee note). While a factfinder might assign less weight to Kokalis's testimony because he has not based it on analysis of quantitative consumer survey data, the testimony he does offer is not inadmissible simply because it is based on his personal expertise. *See Amakua Dev. LLC v. Warner,* 2007 WL 2028186, at *18 (N.D. Ill. July 10, 2007) ([T]he expert's] methodology consists of reviewing the documents in the case and applying his

---

[40] Indeed, the impossibility of "reading minds" is part of why consumer survey information is considered so valuable as an indicator of secondary meaning. *See Sassafras,* 915 F. Supp. at 7–8. Plaintiffs have, unfortunately, not presented such data here, but as we discuss below, the evidence they have marshalled is enough to withstand summary judgment.

[41] To the extent Kokalis offers opinion or factual evidence (such as Appendix C to his report, an internet print-out listing MP5 appearances in popular culture) that is not reasonably derived from his expertise in the field, such evidence can be discounted or disregarded on a more narrow basis. Subject to authentication issues, for instance, Appendix C may serve as documentary evidence of the MP5's popular exposure, but it does not bear the imprimatur of expert opinion.

experience to the facts as they are presented to him by those documents. This is

unobjectionable."). *See also Huss v. Gayden,* 571 F.3d 442, 452 (5th Cir. 2009) ("Rule 702 does

not mandate that an expert be highly qualified in order to testify about a given issue. Differences

in expertise bear chiefly on the weight to be assigned to the testimony by the trier of fact, not its

admissibility."). Whatever the persuasiveness of his views, we believe that Kokalis has

established enough of a nexus between his qualifications and the opinions he derives from them

to render his opinions at least admissible.

   Lastly, Defendants argue that Kokalis's testimony is not helpful to a fact-finder, either

because Kokalis fails to grasp the issue adequately or because he defines the MP5 trade dress

differently than do Plaintiffs. Such an interpretation results from reading his report out of

context. On two occasions, Kokalis stated that he had "difficulty comprehending the point of

Defendants' arguments" or that he had "a problem . . . understanding" Defendants' summary

judgment motion. Kokalis Report ¶¶ 19, 30. These were not confessions of ignorance or

bewilderment; instead, Kokalis was employing a fairly common rhetorical device as a manner of

criticizing *Defendants*' understanding of the issues. As to the identification of the trade dress,

while it is true that Kokalis uses adjectives such as "color" and "texture" that Plaintiffs

themselves do not use in referring to the "overall appearance" of the MP5, his testimony is

consistent with Plaintiffs' interrogatory responses on the question to the extent that he considers

the "overall appearance" to constitute the trade dress. *See* Kokalis Report at ¶ 16; Docket No.

346-6 at 4–5. And contrary to Defendants' insistence otherwise, Kokalis did not "give up" on

attempting to define a trade dress for the MP5 when he stated that "the overall trade dress and

individual components of a submachine gun can vary dramatically." *Cf.* Docket No. 364 at 15

(citing Kokalis Report at ¶ 19). He spoke there of the features that could be said to comprise *a*

trade dress, and in context it is clear that his remark was not a declaration that the MP5 trade dress eludes definition. Kokalis Report ¶ 19. At any rate, such fine-tooth parsing of the accuracy of Kokalis's report, or its consistency with Plaintiffs' other evidence, is not the point of the helpfulness inquiry. *See Smith,* 215 F.3d at 718–719. There is no doubt here that Kokalis's testimony, particularly his analysis of the features of the MP5 when compared to other weapons on the market, is relevant to the question of distinctiveness that the fact-finder may be called upon to resolve.

We therefore reject Defendants' argument that we must disregard the Kokalis expert report, and we proceed to consider the merits of Defendants' trade dress invalidity counterclaim.

## B. Sufficiency of Plaintiffs' Identification of the Trade Dress

Defendants assert that "Plaintiffs' claimed MP5 trade dress fails inasmuch as its constituent elements are unspecified, constitute generic gun parts, and are inconsistently claimed." Docket No. 332 at 54. *See also Maharishi Hardy Blechman Ltd. v. Abercrombie & Fitch Co.*, 292 F. Supp. 2d 535, 542 (S.D.N.Y. 2003) ("A trade dress which is either generic, non-specific, or inconsistent among its products cannot be distinctive."). Defendants are correct to note that before courts can recognize any putative trade dress as "distinctive," they must be able to discern identifiable characteristics in the design a plaintiff seeks to protect. While there is no concrete, authoritative test guiding the courts' evaluation of this issue, two points have particular relevance in guiding our consideration here.

First, the requirement that a trade dress be discrete and identifiable does not preclude a plaintiff from claiming the *overall* look or design of the product as protected. "We have defined 'trade dress' as the 'total image of a product, including such features as size, shape, color or

color combinations, texture, graphics, or even particular sales techniques.'" *Kohler Co. v. Moen, Inc.*, 12 F.3d 632, 641 n.11 (7th Cir. 1993) (quoting *Roulo v. Russ Berrie & Co., Inc.*, 886 F.2d 931, 935 (7th Cir. 1989)). "Doubtless the overall appearance is what matters . . . . Dissecting a product or package into components can cause a court to miss an overall similarity." *See also August Storck K.G. v. Nabisco, Inc.*, 59 F.3d 616, 630 (7th Cir. 1995) (citing *Kohler,* 12 F.3d at 641 n.11). However, the claimed protection must be pitched at the proper level of generality. A plaintiff cannot claim protection for the "genus of which the particular product is a species." *New Colt Holding Corp. v. RJG Holdings of Fla., Inc.*, 312 F. Supp. 2d 195, 203 (D. Conn. 2004) (quoting *Yurman Design, Inc. v. PAJ, Inc.*, 262 F.3d 101, 115 (2d Cir. 2001)). Further, the claimed dress must restrict itself to tangible, rather than ethereal or abstract, design elements. As the Sixth Circuit has explained:

> The aura about a product, the cachet that ownership or display of it creates, and the kind of appeal it has to certain consumers do not dress a good in trade. Rather, those intangible 'things' emanate from the good, its dress, and the marketing campaign that promotes the dressed good. Trade dress is tangible or otherwise objectively observable by the senses; its constitution is a matter of subjective interpretation.[42]

*Abercrombie,* 280 F.3d at 630–631.

Second, and relatedly, a plaintiff must offer some enumeration of the design elements that comprise the "overall look" of a product if such a holistic trade dress claim is to be cognizable. "Simply pointing to a product's overall appearance is [not] enough to state a claim for trade dress infringement. Rather, the overall appearance of the trade dress comes into play

---

[42] The court in *Abercrombie* capped its discussion of the issue by reminding readers of a certain fairy tale: "Lest we lose sight of the body of law here in question, that of trade *dress,* we are reminded that certain 'things' held out as 'dress' are not dress at all." 280 F.3d at 631 (citing Hans Christian Andersen, *The Emperor's New Clothes* (Naomi Lewis, trans., Candlewick Press, 1997)). We reserve judgment on the aptness of the allusion for explaining trade dress rights, but the potency of the imagery is undeniable.

only *after* the trade dress is first properly identified with the discrete elements which make up

that combination . . . separated out and identified in a list." *Weber-Stephens*, 2013 WL 5782433,

at *3 (additional citations omitted). As the Second Circuit noted, failing to require some

specificity in description would make it "too easy for the question of design and configuration

('overall look') to degenerate into a question of quality, beauty, or cachet. . . . The identification

of design elements that compose the asserted trade dress will thus assist in winnowing out claims

that are overbroad as a matter of law." *Yurman*, 262 F.3d at 116–117.

Defendants here object to Plaintiffs' descriptions of the MP5 trade dress on the grounds

that they are impermissibly vague and generic, and that Plaintiffs' enumerations of the elements

of the protected design have been inconsistent over the lifetime of its lawsuits with Defendants.

The first description of the MP5 trade dress to which Defendants point was proffered by HK

USA in response to an interrogatory in the course of the 2009 litigation. When asked to "identify

and describe with particularity each discrete element and each combination of discrete elements

comprising the putative trade dress," HK USA stated that the following photograph was a "fair

depiction" of the trade dress:



Docket No. 332-18 (Defs.' Ex. Q) at 3. In a supplemental response to the same interrogatory, HK

USA provided photographs of the four variations on the core MP5 model--the MP5 A3, the MP5

SD, the Mp5K, and the MP5 A2—reproduced below, clockwise from the top left:



Docket No. 332-19 (Defs.' Ex. R) at 3–6. Plaintiffs also offered a more comprehensive

description to accompany the photographs:

> In truth, as pictured above, there are three basic models: the "MP5K"; the
> "MP5A" (the "MP5A2" features a fixed butt stock and the "MP5A3" features a
> retractable butt stock); and the "MP5SD." Although these weapons are
> compatible with a number of accessories, the recognizability and secondary
> meaning of the famous MP5 shape is not affected by this fact. **HK believes its
> trade dress is reflected in the following elements present in all three basic
> weapons as depicted generally in the pictures . . . : (1) the upper profile
> (including its distinctive front and rear sights); (2) the cocking handle; (3) the
> magazine; and (4) the unique trigger group (including but not limited to the
> fire select switch, trigger guard and grip).** It might be that secondary meaning
> in the marketplace is derived by [sic] a combination of less than all four above-

> described factors, and again, reference is made to the overall shape of the MP5
> weapon as depicted in the photographs below and not necessarily the word
> descriptions above standing alone.

*Id.* at 6–7 (emphasis added). When served with a similar interrogatory in the course of the

current litigation, HK USA initially referred back to this previous response. Docket No. 332-20

(Defs.' Ex. S) at 7–8. After HKG became party to the suit, Defendants served it with a similar

interrogatory. In response, HKG submitted an illustration of the MP5A2 model and a verbal

description that differed somewhat from that offered by HK USA in 2009:

> [The] MP5 trade dress can be defined by the overall silhouette of the MP5
> weapon in its various modularities. In this action, the trade dress and product
> configuration sought to be protected is the entirety of the form, shape, and
> appearance of the well-recognized MP5 weapon. **This can include, but is not
> necessarily limited to, such aspects of the weapon as the unique and
> characteristic gun sighting mechanism, curved ammunition magazine, grip,
> trigger group (including the fire-select switch), trigger guard, barrel stock
> and body casing, including the foregrip.**

Docket No. 332-8 (Defs.' Ex. H) at 2–4. As Defendants note, HKG's 2012 description departs

from HK USA's 2009 description in that it discusses the weapon's "barrel stock" and "body

casing," but does not mention the "cocking handle." Docket No. 332 at 26. Defendants also point

to the deposition of HKG managing director Ihloff, in which he agreed that HK USA's original

2009 illustration of the weapon fairly depicts the "overall look and feel" of the MP5; when asked

if HK USA's original verbal description of the trade dress was accurate, he elaborated: "I think it

would include or can be described and defined in such a way that there may well be other

feature[s], depending on the variants or the registration of the gun. . . . It typically includes

exactly some of these elements as spelled out [in the 2009 interrogatory] or specified here."

Docket No. 332-21 (Defs.' Ex. T) at 103, 113. Ihloff added that, "from a personal perspective,"

there were "details with regards to the sheet metal as well as the type of finishing that is just

beyond functional," and thus also part of the trade dress. *Id.* at 122.

Defendants contend that this body of descriptions contains unduly "generic" language—such as references to the gun's "barrel stock" without any elaboration—and they assail the lack of specificity Ihloff displayed in his deposition (such as his statement that there "may well be other features" in the trade dress) as underscoring the fatal vagueness of the companies' efforts to describe the MP5 trade dress. Docket No. 332 at 56–57. Citing the differences in Plaintiffs' own explanations as well as the (undisputed) existence of numerous variants of the MP5 weapon, Defendants argue that "there is no consistent or constant overall image associated with the product." *Id.* at 57.

While we acknowledge that Plaintiffs have made statements since 2009 that have been unhelpfully vague and that they have not been fully consistent in defining its contours, we conclude that a core, identifiable description of the putative MP5 trade dress has emerged despite these shortcomings. In comparing Plaintiffs' photograph of the original model MP5 with those of MP5 variants, a recurring design profile is recognizable; the structural center of the weapons remains consistent from variant to variant, even as the peripheral elements change. *Compare* Defs.' Ex. Q at 3 *with* Defs.' Ex. R at 3–6. If we leave aside the discrepancies between HK USA's 2009 description of the trade dress and HKG's 2012 description and focus only on design components consistently mentioned, those elements are as follows: the "upper profile"/sighting mechanism, the magazine, the fire select switch, the trigger guard, and the grip.[43] *See* Defs.' Ex. R at 6–7; Defs.' Ex. H at 2–4.[44] While the shape of these individual components may vary to some degree across different versions of the weapon—for instance, the grips of some of the

---

[43] These last three elements comprise what HK USA in 2009 called the "trigger group." Defs.' Ex. R at 6–7.

[44] We agree with Plaintiffs that the companies' considered interrogatory responses carry more weight than HKG managing director Ihloff's (admittedly rather muddled) efforts at describing the trade dress in a 2014 deposition. *See Custom Vehicles, Inc. v. Forest River, Inc.*, 2005 WL 3299499, at *2 (N.D. Ind. Dec. 2, 2005) (noting that a party's deposition testimony does not render "nugatory" its prior interrogatory responses).

weapons have finger grooves, while others do not—their configuration *with respect to each other* adheres to a pattern. We view the arrangement of these consistently-enumerated design elements, which based on the visual evidence do indeed contribute to a consistent "overall look" of the MP5 line of weapons, as an identifiable basis for a trade dress claim.

Examining the facts of two of the decisions upon which Defendants rely most heavily in stressing the stringency of the identifiability requirement helps illustrate the sufficiency of Plaintiffs' descriptions here. In *Weber-Stephen Products, LLC v. Sears Holding Corp.,* 2013 WL 5782433 (N.D. Ill. Oct. 25, 2013), the court found that the plaintiff had not sufficiently identified its putative trade dress in a line of outdoor grills, noting that, "[i]nstead of precisely identifying the character and scope of its trade dress, [plaintiff] simply includes photographs of two entire grills—not even close-ups of particular grill features—and describes its trade dress as "including, *without limitation*, their distinctive shape, proportions and feature placements." 2013 WL 5782433, at *3. "Without more factual detail as to what exactly the grill shapes, proportions, and features are," the court observed, "these extremely broad categories are insufficient to put the Court and Sears on notice of what Weber believes is its protectable trade dress." *Id.* Similarly, in *Yurman Design, Inc. v. PAJ, Inc.*, 262 F.3d 101 (2d Cir. 2001), the Second Circuit found that the manufacturer of a line of rings and bracelets lacked a viable trade dress claim as a matter of law because its minimalist descriptions of the "overall look and feel" of the various products offered no reasonable insight into what, exactly, supposedly tied the products together. The court's explanation is instructive:

> We need not decide whether Yurman could formulate a description of design
> elements to support a trade dress claim sufficient to protect a line of Yurman
> jewelry, because Yurman has not even offered one for our consideration. The
> trade dress of works that are decorative or artistic may be harder to capture in

69

words, and may need descriptions more broadly framed, or may need drawings;
but the party seeking protection must nonetheless be able to point to the elements
and features that distinguish its trade dress. Pressed by PAJ on appeal to provide
some description of its trade dress, Yurman produced the following: "the artistic
combination of cable [jewelry] with other elements." But the word "artistic"
simply begs a question; and unless Yurman seeks protection for cable itself, the
jewelry must be supposed to combine cable "with other elements." This
articulation is altogether too broad to be a protectable, source-identifying
expression.

262 F.3d at 117–118.

Here, by contrast, Plaintiffs seek to protect the overall design of the MP5 line, but, unlike

the claimants in *Weber-Stephen* or *Yurman*, they have described a discernible body of design

elements that allows the court to evaluate the claimed trade dress within the realm of tangible

reality rather than that of guesswork or abstract aesthetic speculation. They have identified the

elements that constitute the overall design of their product much as a gun manufacturer seeking

trade dress protection in a Colt revolver did in *New Colt Holding Corp. v. RJG Holdings of*

*Florida, Inc.*, 312 F. Supp. 2d 195 (D. Conn. 2004). There, the plaintiff claimed "the overall

appearance of the gun" as its protectable trade dress, but it supplemented that description with a

brief enumeration of the gun's salient components. 312 F. Supp. 2d at 205. Setting aside the

defendant's objections that these descriptions lacked the requisite specificity and that there had

been variations in the shape or appearance of various components of the gun over time, the court

nonetheless determined that the plaintiff had identified its trade dress sufficiently, concluding

that "any lack of clarity in Plaintiffs' descriptions stems from their attempts to claim the entire

appearance of the revolver and the difficulty inherent in adequately describing all the requisite

details." *Id.* at 206. Although Plaintiffs' efforts to delineate the scope of their trade dress have

not been a model of explanatory precision or of consistency, their descriptions have been

detailed enough, and enough in sync with the visual evidence of the appearance of the MP5 weapons, to be readily identifiable.

## C. Non-Functionality

The Lanham Act provides that, in an "action for trade dress infringement under this chapter . . . the person who asserts trade dress protection has the burden of proving that the matter sought to be protected is not functional." 15 U.S.C. § 1125(a)(3). The Supreme Court has expanded and refined its operative definition for "functionality" over the years, and it has lately endorsed two complementary formulations. "'In general terms, a product feature is functional,' and cannot serve as a trademark, 'if it is essential to the use or purpose of the article or if it affects the cost or quality of the article.'" *TrafFix Devices, Inc. v. Mktg. Displays, Inc.*, 532 U.S. 23, 29 (2001) (quoting *Inwood Labs., Inc. v. Ives Labs., Inc.*, 456 U.S. 844, 850 n.10 (1982)). A feature may also be classified as functional if it "is one the "exclusive use of [which] would put competitors at a significant non-reputation-related disadvantage." *Qualitex Co. v. Jacobson Prods. Co., Inc.* 514 U.S. 159, 165 (1995). As the Seventh Circuit has recognized, the core question to be answered is whether a particular design has value for its aesthetic quality—and as a means of source-identification in the marketplace—or, rather, whether the design exists so that the product can perform its intended function better. *Specialized Seating, Inc. v. Greenwich Indus., LP*, 616 F.3d 722, 727 (7th Cir. 2010). "So if a design enables a product to operate, or improves on a substitute design in some way (such as by making the product cheaper, faster, lighter, or stronger), then the design cannot be trademarked . . . ." *Jay Franco & Sons, Inc. v. Franek,* 615 F.3d 855, 857 (7th Cir. 2010).

The Seventh Circuit has endorsed a list of five factors useful for evaluating claimed feature or product designs within this conceptual framework. These are:

> "(1) [T]he existence of a utility patent, expired or unexpired, that involves or describes the functionality of an item's design element; (2) the utilitarian properties of the item's unpatented design elements; (3) advertising of the item that touts the utilitarian advantages of the item's design elements; (4) the dearth of, or difficulty in creating, alternative designs for the item's purpose; (5) the effect of the design feature on an item's quality or cost."

*Georgia-Pacific Consumer Prods. LP v. Kimberly-Clark Corp.*, 647 F.3d 723, 727–728 (7th Cir. 2011). In considering the functionality or non-functionality of Plaintiffs' claimed MP5 trade dress, it is important to emphasize that functionality is fundamentally a question of fact.

*Specialized Seating,* 616 F.3d at 726 ("'Functionality' certainly isn't an issue of law; it represents a fact-specific conclusion . . . ."); *Modern Fence Technologies, Inc. v. Qualipac Home Imp. Corp.*, 726 F. Supp. 2d 975, 987–988 (E.D. Wis. 2010) (citing *Service Ideas, Inc. v. Traex Corp.*, 846 F.2d 1118, 1123 (7th Cir. 1988)). It is therefore appropriate for disposition on summary judgment only where a plaintiff is unable to meet its burden of raising a genuine issue of material fact that its trade dress is nonfunctional. *Invisible Fence, Inc. v. Perimeter Techs., Inc.,* 2007 WL 273129, at *9 (N.D. Ind. Jan. 26, 2007). *See also Clicks Billiards, Inc. v. Sixshooters, Inc.*, 251 F.3d 1252, 1262 (9th Cir. 2001).[45] Cognizant of this standard, we review the applicability to Plaintiffs' trade dress of the five criteria enumerated by the Seventh Circuit.

## 1.  The existence of a utility patent

---

[45] Defendants are correct to note that Plaintiffs bear the ultimate burden of persuasion on the issue of functionality, as specified by Section 43(a) of the Lanham Act. Docket No. 332 at 58–59. They go astray, however, in implying that Plaintiffs must *prove* non-functionality in order to survive a motion for summary judgment. They also err in their conception of the five-part Seventh Circuit "test" for functionality: it is a list of probative factors rather than prerequisites. *See Georgia-Pacific,* 647 F.2d at 727.

The existence of a utility patent for a given product design (or design feature) is "strong evidence of functionality." *Georgia-Pacific,* 647 F.3d at 728. "If trade dress protection is sought for those features[,] the strong evidence of functionality based on the previous [utility] patent adds great weight to the statutory presumption that features are deemed functional until proved otherwise by the party seeking trade dress protection." *TrafFix,* 532 U.S. at 29–30. Any overlap with a patent is a "cheat sheet" for functionality because "any design claimed in a patent is supposed to be useful." *Jay Franco & Sons, Inc. v. Franek*, 615 F.3d 855, 857 (7th Cir. 2010). So persuasive are utility patents as evidence of functionality, in fact, that all of the decisions cited by the *Georgia-Pacific* court in support of its statement that summary judgment may be granted in "appropriate cases" relied strongly on the "presumption of functionality" created by the existence of a relevant patent in the feature. *See TrafFix,* 532 U.S. at 29–30; *Specialized Seating,* 616 F.3d at 727; *Eco Mfg. LLC v. Honeywell Int'l, Inc.*, 357 F.3d 649, 653 (7th Cir. 2003) (determining summary judgment appropriate where plaintiff had failed to overcome the "heavy burden" created by the existence of a utility patent"); *Franek,* 615 F.3d at 857–859 (noting that the "*TrafFix* presumption" of functionality applied and supported summary judgment). *See also Georgia-Pacific,* 647 F.3d at 728.

Here, Defendants bring to our attention no utility patents for designs overlapping with Plaintiffs' claimed design features. While the absence of such patents does not preclude the functionality of the design, of course, the lack of a "cheat sheet" creating a presumption of functionality makes it considerably less likely that functionality could be determined on summary judgment. *Cf. TrafFix,* 532 U.S. at 29–30.

### 2. Utilitarian properties of the design elements

Defendants present extensive evidence that individual features of the MP5, including those design components that we have recognized as part of Plaintiffs' identifiable claimed trade dress, have utilitarian properties. This evidence includes HK USA president Weber's testimony that elements such as the fire-select switch, the trigger guard, and the grip have features that enhance the user-friendliness[46] or efficiency of the weapon rather than serving purely aesthetic purposes. *See* Docket No. 333-9 (Defs.' Ex. JJ) at 71, 73, 124–125, 127, 128, 130–131. As to the gun sighting mechanism, an operator's manual describes how the two sights on the top of the weapon employ concentric circles to enhance the accuracy of aim. Docket No. 333-10 (Defs.' Ex. KK) at 68; Docket No. 334-3 (Defs.' Ex. SS) at 6. *See also* Docket No. 333-14 (Defs.' Ex. OO) at 115–116; Defs.' Ex. JJ at 120. Lastly, Weber explained that the MP5 line uses curved magazines in part to facilitate the more efficient feeding of ammunition into the firing chamber and to solve "feed problems" that had previously existed with straight-shaped magazines. Defs.' Ex. JJ at 136, 140–141; Defs.' Ex. OO at 134; Defs.' Ex. KK at 5.

Plaintiffs largely do not dispute the utilitarian qualities of various individual components of the MP5 design. Rather, they stress that a product's *overall* configuration may still be non-functional even if a large portion of its component features are functional. "[A] product whose overall appearance is distinctive can be protected under the trademark laws, even though most of the products constituent elements serve some function." *Specialized Seating,* 616 F.3d at 727. When concededly utilitarian components comprise a putatively non-functional whole, "the critical question is the degree of utility present in the *overall* design of the mark." *In re Becton, Dickinson & Co.,* 675 F.3d 1368, 1373 (Fed. Cir. 2012). (emphasis added). On one hand, trade

---

[46] Macabre though the term "user-friendliness" may be to describe a military-style machine gun, we must consider the weapon in this respect as if it were any other consumer item.

dress protection can extend to designs that are "ornamental, fanciful, [and] decorative," for such aesthetically-based configurations "are not in short supply, so appropriating one of them to serve as an identifying mark does not take away from any competitor something that he needs in order to make a competing brand." *W.T. Rogers Co., Inc. v. Keene,* 778 F.2d 334, 339 (7th Cir. 1985). In the broadest sense, this is what separates the shape of a football, unusual and iconic though it might be, from the design of a car's hood ornament; a football's shape cannot be a trade dress because its oblong shape is what makes it a football, while a car will serve its purpose no matter which of the infinite styles of front bumper or hood ornaments are placed upon it. *Id.* at 339–340. On the other hand, however, the Seventh Circuit has cautioned, a design may be functional even though it is not the only possible utilitarian configuration. In *Specialized Seating, Inc. v. Greenwich Industries, LP*, 616 F.3d 722 (7th Cir. 2010), for instance, the court ruled that a particular design for an x-frame folding chair was functional "not because it is the only way to do things, but because it represents one of many solutions to a problem," based on the overall configuration's "favorable strength-to-weight ratio." 616 F.3d at 727.

Here, Plaintiffs contend that the arrangement of weapon features that constitutes its trade dress is essentially arbitrary, and provides value as a stylistic profile or signature. In fact, they contend, the MP5 is a "heritage firearm," without any overall utilitarian advantages over modern competitors with more advanced designs. Weber Decl. ¶ 8. In support of this argument, Plaintiffs rely primarily on the expert report of Peter Kokalis, who opines that "[t]he MP5 trade dress constitutes a combination of design elements in an arbitrary and protectable product configuration," and that "[t]here are infinite potential combinations of material, design elements, and mechanical geometries available to firearm manufacturers." Docket No. 346-8 (Kokalis

Report) at ¶¶ 12, 72.[47] Weber's testimony is in the same vein: "HK could exchange each of the MP5 design elements with alternative design elements such that the visual appearance of the firearm would be radically different than the MP5 trade dress and the firearm would still fire just as smoothly, accurately, and reliably." Weber Decl. ¶ 9. Finally, Plaintiffs point to visual evidence of a number of other weapons that contain the same core of features, but whose overall design configuration is nonetheless significantly and recognizably different.[48] *See* Kokalis Report, Appx. B.

While the nature of a firearm mandates that any marketable gun contain certain functional features, "the fact that an item serves or performs a function does not mean that it may not at the same time be capable of indicating sponsorship or origin, particularly where the decorative aspects of the item are nonfunctional." *Dallas Cowboys Cheerleaders. Inc. v. Pussycat Cinema, Ltd.*, 604 F.2d 200, 204 (2d Cir. 1979). *See also* Docket No. 346-26 (Pls.' Ex. 26) (PTO trade dress registration for the particular configuration of the Thompson machine gun). Plaintiffs have at least raised an issue of fact as to whether the particular configuration of parts embodied in the MP5 line of weapons is non-functional, despite the inescapably functional nature of some of the components themselves. *Cf. Service Ideas, Inc. v. Traex Corp.*, 846 F.2d 1118, 1123 (7th Cir. 1988). We therefore conclude that the utilitarian features of the weapon to which Defendants point are not necessarily fatal to Plaintiff's case for non-functionality.

### 3. The existence of advertising touting the design's utilitarian qualities

---

[47] Plaintiffs filed the Kokalis Report manually rather than on the electronic docket.
[48] Plaintiffs also point to the existence of a design patent for the GSG-522 (a weapon whose alleged infringement of the MP5 trade dress is at issue in this case), which GSG characterized in an application to the PTO as an "ornamental design for semi-automatic firearm." Docket No. 346-17.

Where a company's advertising "unequivocally link[s]" its product design to functional benefits, a court is justified in weighing its own word against its claim of non-functionality. *See Georgia-Pacific,* 647 F.3d at 730; *Mortar Net USA, Ltd. v. Hohmann & Barnard, Inc.*, 2013 WL 5407183, at *3 (N.D. Ind. Sept. 26, 2013). Here, Defendants point to a limited number of instances in which, they assert, Plaintiffs advertised the MP5 using the language of utility.

First, in what appear to be magazine advertisements, HK USA quoted Alan Ladd in the 1953 film *Shane*, who stated that "[a] gun is a tool"; they then added the tagline that HK produces "power tools for a new century." Docket No. 333-7 (Defs.' Ex. HH). In another brochure, HK USA boasts that the HK94, which it characterizes as "a direct offspring of Heckler & Koch's renowned family of MP5 Submachine Guns," is "[d]esigned and built with only one thing in mind: uncompromising performance." Docket No. 333-6 (Defs.' Ex. GG) at 2. Later in the same item, the company concludes its ad copy with another tagline: "At Heckler & Koch, form follows function."  *Id.* at 4. These items are less than persuasive as evidence of "utilitarian" advertising for two reasons: first, the statements in question are little more than non-specific puffery; second, and more important, none of the statements actually refer to the MP5 line. The assertion that the HK94, "offspring" of the MP5, has value for its "uncompromising performance" is hardly the same as advertising the parent weapon on specifically utilitarian grounds.

Defendants secondly point to a 2001 book, the Heckler & Koch "official history," which contains the following statement: "A weapon, and particularly a sub-machine gun is undeniably a technical item. But why should one restrict oneself to sheer functionality if there are vacant MP5 surfaces inviting decoration?" Docket No. 333-5 at 264–265. Leaving aside the question of whether the statements contained in such a book are "advertising" materials for the MP5, we do

not believe that this statement, when placed in context, touts the MP5 as a functional item. The book's authors refer to the MP5's "vacant spaces" in tongue-in-cheek fashion, by way of introducing a series of photographs—labeled "beauties"—displaying highly elaborate special-edition weapons, including a gold-plated MP5 and a gun decorated with ivory animal motifs apparently given as a gift from the company to the late Shah of Iran. *Id.* at 264. While the design of the MP5 may be pedestrian in comparison with these one-off curiosities, it is difficult to read this bit of text as a serious assertion that the MP5's design is itself functional rather than aesthetic in value. Lastly, a company-issued calendar, which contains several blurbs discussing the MP5, notes that "current MP5 models still boast of features seldom found on any other weapons." It goes on to describe the quality of the steel use to produce the gun's barrel and the weapon's modularity, while its trigger mechanisms are "a rarity these days." Docket No. 332-22 at 4. But the features of which the calendar boasts in functional terms—namely the quality of the gun's steel and its modular capabilities—are not claimed by Plaintiffs as part of its trade dress; while the trigger unit is part of the trade dress, the reason the calendar describes it as a "rarity" is that most other modern designs have supplanted the original MP5 system with a more fully automatic trigger mechanism. *Id.*

In *Georgia-Pacific,* the Seventh Circuit determined that advertisements for a brand of toilet paper singing the praises of its quilted design—"quilted to create thousands of places for moisture to go" and "gently quilted together to give you and your family exceptional softness and comfort"—weighed in favor of functionality. "[T]he language in the ads is clear—the Quilted Diamond Design is unequivocally linked to functional benefits such as absorbency, softness, and comfort." 647 F.3d at 730. The advertising materials that Defendants have identified here stand in contrast; none urges the consumer to purchase the MP5 on the strength of

any particular utilitarian quality. On the flip side of the coin, as Defendants points out, Weber testified that the company's advertising "definitely [doesn't] characterize [the MP5] as a distinctive trade dress." Docket No. 332-2 (Defs.' Ex. C) at 223. For this reason, we find that the Heckler & Koch advertisements have little to say on the question.

### 4. "The dearth of, of difficulty in creating, alternative designs for the item's purpose"

As we have noted, a product design is likely to be considered functional if it represents a "solution to a problem"—if, in other words, its protection as trade dress would deprive competitors of a uniquely efficient or useful design, even if other possible designs exist. To use the example of the folding chair design at issue in *Specialized Seating,* this factor is therefore implicated where, though other chair designs are possible, creating an alternative design that achieves a particular, desirable "strength to weight ratio" would be difficult or impossible. 616 F.3d at 727. In the case at hand, then, we must ask a teleological question: whether the particular design of the MP5 makes it tangibly better at achieving the ends of submachine guns such that locking up the design under the aegis of one brand will harm the consumers' interests.

Plaintiffs again lean on the Kokalis expert report, which states that other designs fulfilling the same purpose are not only possible, but plentiful. Docket No. 246-10 at ¶¶ 17, 22. In fact, Kokalis asserts, a rival manufacturer endeavoring to copy the design of the MP5 for a .22 caliber weapon—such as GSG's allegedly infringing version of its GSG-522—would place itself at a functional *disadvantage,* because a modern gun of smaller caliber can be built lighter and more flexible. *Id.* at ¶ 81. Despite their success in showing the functional value of individual components, Defendants have presented no evidence supporting a theory that the MP5 represents

even "one of many solutions to a problem." *Cf. Georgia-Pacific,* 647 F.3d at 731 (citing

*Specialized Seating,* 616 F.3d at 727).

### 5. Effect of the design on the item's quality or cost

As to this final factor, Plaintiffs assert that, although the manufacturing quality of the

MP5's components may differentiate them from comparable alternatives, nothing about the

design arrangement itself drives the gun's quality or cost. Docket No. 346 at 4, 8 (citing Kokalis

Report at ¶¶ 4, 77; Weber Decl. ¶ 10). According to Weber, the MP5 "clones" products sold by

GSG, despite having the same design, sell for roughly 80% less because of this difference in

manufacturing quality. Weber Decl. ¶ 10. Defendants do not directly assail Plaintiff's evidence

on this score; instead, they argue that "[e]xpense does not establish non-functionality; nuclear

reactors are expensive to make, while paperclips are not." Docket No. 364 at 30. While it is, of

course, true that Plaintiffs' evidence here does not *establish* non-functionality, it is at least

relevant to the question of whether the design—as opposed to other factors—differentiates the

product in terms of quality or cost.

In sum, we determine that Plaintiffs have at least raised a genuine issue of material fact

with respect to the non-functionality of the MP5 design in which they claim trade dress.

Defendants' evidence of the functionality of the weapon's components will be highly relevant to

a fact-finder, but the question remains whether the design of the whole has an aesthetic or

source-identifying value that transcends the utilitarian qualities of its constituent elements. The

lack of a utility patent, coupled with the lack of strong evidence in Defendants' favor with

respect to any of the remaining evaluative factors identified by the Seventh Circuit, leads us to

conclude that summary judgment against Plaintiffs on the question of functionality is not appropriate.

**D. Secondary Meaning**

In order to qualify as "distinctive" and thus eligible for protection under the Lanham Act, an unregistered trade dress must possess a secondary meaning. *Wal-Mart Stores,* 529 U.S. at 210–215; *Bodum USA, Inc. v. La Cafetiere, Inc.*, 621 F.3d 624, 627 (7th Cir. 2010). "[A] mark has acquired distinctiveness, even if it is not inherently distinctive, if it has developed secondary meaning, which occurs when, 'in the minds of the public, the primary significance of a [mark] is to identify the source of the product rather than the product itself.'" *Id.* at 211 (quoting *Inwood Labs., Inc. v. Ives Labs., Inc.*, 456 U.S. 844, 851 n.11 (1982)). Proof of secondary meaning can be established through direct consumer testimony, consumer surveys, length and manner of use, amount and manner of advertising, volume of sales, place in the market, and evidence of intentional copying. *Packman v. Chicago Tribune,* 267 F.3d 628, 641 (7th Cir. 2001).

Defendants assert that the MP5 design lacks secondary meaning because the market is flooded with MP5 look-a-likes or unlicensed or altered versions of the weapon. As evidence, they cite manuals distributed to owners by Plaintiffs themselves, warning that "[t]here are a lot of look-alike products being sold today that are not produced by HK. There are also used MP-5's available that were not reconditioned by HK, GmbH or HK, Inc." Docket No. 332-23 (Defs.' Ex. V) at 12. Defendants also provide evidence of a number of firms in the United States and elsewhere that sell knock-off or imitation MP5s, or that produce kits that can be assembled into weapons resembling the MP5. *See* Docket No. 332 at 27–28, ¶¶ 74–82. Additionally, Defendants assert that Plaintiffs have been lax in allowing the proliferation of these imitators. They note that

Plaintiffs have never made a valuation of the alleged MP5 trade dress, Docket No. 332 at 29, ¶ 84, and that HK USA official Steven Galloway conceded that the company had hired an investigative firm to track down copycats after discerning that it had been "negligent" or "inattentive" in "protecting our intellectual property." Defs.' Ex. C at 142, 171–172. Citing McCarthy on Trademarks, they contend that the MP5 lacks distinctiveness if it is "hemmed in on all sides by similar marks on similar goods." 2 McCarthy on Trademarks and Unfair Competition § 11:85 (4th ed.). "When numerous sellers in a product or service line use similar marks, there may be little if any individual distinctiveness and consumers may have difficulty telling one seller from another." *Id.*

We do not read McCarthy on Trademarks to suggest that the existence of a "crowded field" forecloses the existence of secondary meaning if the competitors are imitators who have entered the market to capitalize on the familiarity or cachet of a pre-existing design.[49] *Cf. Eastland Music Group, LLC v. Lionsgate Entm't, Inc.*, 707 F.3d 869, 871 (7th Cir. 2013) (observing that a plaintiff was "a very junior user and in no position to complain . . . . [Plaintiff] *entered* a crowded field, and its rights are correspondingly weak and narrow.") (emphasis added). The consumer "confusion" created in such a market of imitators stems not from the fact that a product's name or design fails to stand out, but rather that it stands out *too much,* attracting other producers who seek to co-opt it. And in fact, as Plaintiffs point out, evidence of intentional copying, far from being fatal to a claim for secondary meaning, is probative of it. *Schwinn Bicycle Co. v. Ross Bicycles, Inc.*, 870 F.2d 1176, 1182 n.13 (7th Cir. 1989).

---

[49] Further, while Plaintiffs' alleged inattentiveness to protecting their intellectual property may be a valid equitable issue, we are unaware of any precedent for its relevance to the question of whether the trade dress itself has acquired secondary meaning as defined by the Supreme Court and the Seventh Circuit.

Here, in addition to the evidence that Defendants have designated regarding the existence of MP5 imitators and repackagers, *see* Docket No. 332 at 27–28, ¶¶ 74–82, Plaintiffs point to evidence that GSG and ATI themselves have engaged in intentional copying. One GSG advertisement exclaims that "The GSG-5 is an identical replication of the MP-5 except one great thing: it's a 22 cal." Docket No. 346-19 (Pls.' Ex. 12) at 2. Another GSG advertisement touts: "The world's most recognizable tactical carbine is now available for the everyday shooter! The GSG-5 is an identical clone of the renowned MP5 with one major change – it fires .22LR!" Docket No. 346-10 (Pls.' Ex. 13). Two ATI executives stated in deposition testimony that the GSG-5 intentionally resembled the MP5, making it "more attractive" than other cheap guns on the market. Docket No. 347-5 (Defs.' Ex. 14) at 35; Docket No. 347-8 (Defs.' Ex. 19). Though courts in the Seventh Circuit have stopped short of according a presumption of secondary meaning to a trade dress on the strength of evidence of intentional copying, they have recognized such evidence as highly persuasive. *See Schwinn Bicycle,* 870 F.2d at 1182 n.13; *Turtle Wax, Inc. v. First Brands Corp.*, 781 F. Supp. 1314, 1324 (N.D. Ill. 1991).

Plaintiffs also present some evidence of the MP5's "place in the market." HK USA president Weber testifies to the MP5's extensive presence at trade shows, Weber Decl. ¶¶ 3–5, 6, 10, and Plaintiffs' expert, Kokalis, avers that the gun has been featured in "well over 100 feature films and countless television episodes, books, and articles." Kokalis Report at ¶ 80. Even more striking evidence of the MP5 design's place in the market is GSG's advertising of its expressly imitative weapons—advertising clearly plays on the fame of the physical profile of the MP5, describing it as "renowned" and the "world's most *recognizable* tactical carbine." Pls.' Ex. 13 (emphasis added). Plaintiffs have also made at least a minimal showing of the MP5's volume of sales and its history of use. Although Plaintiffs' sales data is not comprehensive, it does show

that the MP5 sold in considerable volume in the years 2005–2014. Docket No. 335-2 (Defs.' Ex. III).[50] More persuasively, Plaintiffs note that the MP5 design has been used consistently since 1966—for almost 50 years. As the court noted in *Turtle Wax, Inc. v. First Brands Corp.*, 781 F. Supp. 1314, 1324 (N.D. Ill. 1991), evidence of the commercial success of a product design is entitled to greater weight in proportion to the time the product has been on the market. Secondary meaning, after all, cannot by its very nature develop overnight, for a trade dress with secondary meaning "is not inherently distinctive but is claimed to have become identified with the producer over time." *Schwinn Bicycle,* 870 F.2d at 1182 n.13. The assertion that a design with such a comparatively venerable pedigree has acquired secondary meaning is therefore considerably more reasonable than a similar claim made on behalf of a recent entry on the market.

In a small but perhaps telling linguistic slip, Defendants argue that they have successfully "put at issue" Plaintiffs' claim of secondary meaning for the MP5. Docket No. 364 at 32. Indeed, as the evidence we have discussed above demonstrates, there is at least a genuine unresolved factual issue as to this element. *See Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 767 (1992) (discussing secondary meaning as a question subject to jury fact-finding). It is Defendants' burden, of course, as the moving party, to demonstrate the *absence* of a factual question; because they have failed to do so, summary judgment in their favor on secondary meaning is unwarranted.

**E. Abandonment**

---

[50] Because this exhibit has been sealed and the precise volume of sales is not relevant to our resolution of the issue, we need not go into any further detail regarding the sales numbers.

The abandonment of an alleged trade dress is an affirmative defense to a claim for trade dress infringement.[51] A party may be held to have abandoned its trade dress where it has engaged in "naked licensing"—that is, "allowing others to use the mark without exercising 'reasonable control over the nature and quality of the goods, services, or business on which the [mark] is used by the licensee.'" *Eva's Bridal Ltd. v. Halanick Enters., Inc.*, 639 F.3d 788, 789 (7th Cir. 2011) (citing Restatement (Third) of Unfair Competition §§ 30, 33 (1995)). *See also Carl Zeiss Stiftung v. V.E.B. Carl Zeiss, Jena*, 293 F. Supp. 892, 918 (S.D.N.Y. 1968) ("[A] 'naked' license *may* be the basis for an *inference* of abandonment where the licensor maintains no control over the quality of goods made by the licensee.").

Defendants argue that HK USA engaged in naked licensing in signing the 2009 Agreement with them. They present their case in a conceptually muddled fashion[52], but its core assertion is that, by "approving" the design for the GSG-522 as attached to the Agreement and covenanting not to sue GSG for the sale of the GSG-522, HK USA gave away the store, thereby forsaking any ability to engage in quality control. Docket No. 332 at 70. "Therefore," Defendants urge, "Plaintiffs contractually precluded themselves from enforcing the quality of a product they contend violates the alleged MP5 trade dress, working an abandonment." *Id.*

The abandonment claim fails because the Agreement did not license the MP5 to Defendants. "[A] license to use a mark . . . is a transfer of limited rights, less than the whole interest which might have been transferred." *Exxon Corp. v. Oxxford Clothes, Inc.*, 109 F.3d 1070, 1076 (5th Cir. 1997). The essential inquiry is whether, "under cover of the agreement

---

[51] As such, the abandonment claim would apply not only to Defendants' counterclaim for invalidity, but also as a defense to Plaintiffs' Lanham Act trade dress infringement and dilution claims. Our conclusion that the defense fails as a matter of law applies to its use in conjunction with those claims as well.

[52] In the same breath as they describe the Agreement as a naked license, they state: "Yet the Agreement is not a license but a freedom to practice within the 'safe harbor.'" Docket No. 332 at 70.

claimed to be a license, 'the licensee is engaging in acts which would infringe the licensor's mark but for the permission granted in the license.'" *Id.* (quoting 2 McCarthy on Trademarks § 18:79). The portion of the 2009 Agreement to which Defendants refer surrendered no rights in the MP5 at all; rather, it stipulated that a certain GSG design for the "GSG-522" weapon did *not* infringe the MP5 trade dress. Docket No. 45-1 at ¶ 5.

Plaintiffs cannot be guilty of naked licensing where they have not granted a license at all. Defendants wisely discard their naked licensing claim in their reply brief, and they have presented no other arguments in support of an abandonment affirmative defense.

Therefore, having concluded that Plaintiffs have sufficiently identified their alleged trade dress and that they have propounded evidence creating a genuine issue of material fact with respect to functionality and secondary meaning, we DENY Defendants' motion for summary judgment on Counterclaim Count XI.

## VII.    Plaintiffs' Federal Trade Dress Claims

Defendants seek summary judgment on three federal trade dress claims contained in Plaintiffs' Amended Complaint: Count V for trade mark dilution under Section 43(c) of the Lanham Act, 15 U.S.C. § 1125(c); Count VI for infringement of an unregistered trade dress under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a); and Count VII for common-law trade dress infringement. Docket No. 332 at 70.

As we have noted, a plaintiff under Section 43 of the Lanham Act must establish that its trade dress is protectable in order to press a claim for infringement or dilution. Defendants reprise here their arguments that Plaintiffs' putative trade dress is insufficiently identified, functional, and lacking secondary meaning. We have already considered and rejected those

arguments, determining that summary judgment is unwarranted on the protectability of

Plaintiffs' claimed trade dress. *See supra* § VI.

     The only new argument Defendants present here concerns Plaintiffs' trade dilution

claim.  Section 43(c) of the Lanham Act provides:

> [T]he owner of a **famous** mark that is distinctive, inherently or through acquired
> distinctiveness, shall be entitled to an injunction against another person who, at
> any time after the owner's mark has become famous, commences use of a mark or
> trade name in commerce that is likely to cause dilution by blurring or dilution by
> tarnishment of the famous mark, regardless of the presence or absence of actual or
> likely confusion, of competition, or of actual economic injury.

15 U.S.C. § 1125(c)(1) (emphasis added). The Act further clarifies that a mark is defined as

"famous" if it is "widely recognized by the general consuming public of the United States as a

designation of source of the goods or services of the mark's owner." 15 U.S.C. § 1125(c)(2)(A).

Defendants allege that, because Plaintiffs have failed to identify or sufficiently define their trade

dress, they "cannot show as a matter of law that the alleged MP5 trade dress . . . is recognized by

the general consuming public of the United States . . . ." Docket No. 332 at 71.

     Defendants fail to offer any support for their contention that the MP5 trade dress is not

famous. They correctly note that Plaintiffs must "show that the alleged MP5 trade dress is

famous [apart] from the 'MP5' mark *required to be engraved* on each such firearm," but they err

in supposing that this statutory requirement is anything other than a restatement of the

unremarkable principle that the trade *dress* rather than the verbal MP5 trademark must qualify

for protection. Although they cite two district court cases[53] stating that "niche fame" is

insufficient to qualify a trade dress as "famous," they make no actual argument that the MP5

---

[53] Namely, *Mike Vaughn Custom Sports, Inc. v. Piku,* 2014 WL 1673827 (E.D. Mich. 2014), and *Luv N' Care, Ltd. v. Regent Baby Prods. Corp.*, 841 F. Supp. 2d 753, 757–758 (S.D.N.Y. 2012).

trade dress enjoys only niche fame—or that it falls short of establishing any of the elements necessary to prevail on a trade dilution claim. *See Syndicate Sales, Inc. v. Hampshire Paper Corp.*, 192 F.3d 633, 639 (7th Cir. 1999). Defendants' only substantive argument, in fact, is the one-sentence assertion that Plaintiffs cannot make a showing that the MP5 is "famous" because they "cannot even define it consistently or specify non-generic firearm parts." Docket No. 332 at 72. This merely recapitulates their contention that the trade dress is not identifiable—an argument we have already addressed and set aside. *See supra,* § VI(A).

Defendants' motion for summary judgment on Counts V, VI, and VII of Plaintiffs' Amended Complaint is therefore DENIED. Defendants have also moved for summary judgment on Counterclaim Count XII, which seeks a declaratory judgment of Defendants' non-infringement. The parties did not specifically address Counterclaim Count XII, but we DENY Defendants' motion for declaratory judgment of non-infringement for the same reason that we deny Defendants' motion as to Plaintiffs' claims for infringement.

## VIII.   Plaintiffs' Count IX – State Trademark Infringement

Count IX of Plaintiffs' Amended Complaint states a claim for state trademark infringement under Indiana Code § 24-2-1-13. Docket No. 45 at 12. The Indiana Trademark Act, Ind. Code § 24-2-1 *et seq.*, imposes liability when a defendant uses a "reproduction, counterfeit, copy, or colorable imitation" of a registered mark either: (1) "in connection with the sale, offering for sale, distribution, or advertising of goods or services," or (2) "on or in connection with which the use is likely to cause confusion or mistake, or result in deception regarding the source of origin of the goods or services." Ind. Code § 24-2-1-13(1); *Feisher v. Univ. of Evansville,* 755 N.E.2d 589, 599 (Ind. 2001). Because Indiana's body of trademark law is

"relatively undeveloped," the Indiana Trademark Act "is intended to provide a system of state trademark registration and protection that is consistent with the federal system of trademark registration." *Serenity Springs v. LaPorte Cnty. Convention & Visitors Bureau*, 986 N.E.2d 314, 323 (Ind. Ct. App. 2013) (citing Ind. Code § 24-2-1-0.5). The state's law therefore tracks the terminology of the Lanham Act almost identically, and the essential elements of a state claim are the same as those of a federal one, with one notable difference. *Id.* Unlike the federal statute, the Indiana Trademark Act makes state registration of a trademark an explicit prerequisite to recovering for its infringement. Ind. Code § 24-2-1-14(a).

Defendants advance two grounds for summary judgment on this claim: that a cause of action for trade *dress* infringement is not cognizable under the Indiana statute, and that in any case Plaintiffs have failed to meet the incorporated Lanham Act requirements of "nongenericness, specificity, consistency, and nonfunctionality" as a matter of law. Docket No. 332 at 72.

As we have stated, the body of Indiana trademark infringement law is not richly developed. Given that the state's courts have reaffirmed quite recently that the state law aims at creating a "system of state trademark registration and protection that is consistent with the federal system of trademark registration," however, we can perceive no reason why the state law would not follow in the footsteps of federal law in recognizing trade dress protection. *See Serenity Springs v. LaPorte Cnty. Convention & Visitors Bureau*, 986 N.E.2d 314, 323 (Ind. Ct. App. 2013). Defendants have certainly presented no substantive argument in favor of the theory that trade dress is unprotected under state law. We have already implicitly recognized Count IX as a cognizable cause of action, *see* Docket No. 215 at 24–25 (denying Defendants' motion to dismiss), and we do not disturb that conclusion now.

Recognizing the parallel nature of the federal and state claims, Defendants' only argument for summary judgment on the merits is that Plaintiffs have failed to establish the elements of their Lanham Act claims. Docket No. 332 at 72. Just as we have rejected those arguments once, we do so again here.

Defendants' motion for summary judgment as to Count IX of Plaintiffs' Amended Complaint is therefore DENIED.

## IX.  Defendants' Counterclaim Count X – Declaratory Judgment for No Breach of Contract by GSG and ATI

Defendants seek a declaratory judgment in their favor that they are not liable to Plaintiffs' for their alleged breach of the 2009 Agreement, on the grounds that Plaintiffs are guilty of a first material breach. Docket No. 251 at 55. Because they "breached the confidentiality clause before the ink was dry" and attaching a copy of the Agreement in an email to an executive with non-party Umarex shortly after the settlement was signed, Defendants insist, Plaintiffs cannot recover for any subsequent breaches by Defendants as a matter of law. Docket No. 332 at 73.

"[A] party first guilty of a material breach of contract may not maintain an action against the other party or seek to enforce the contract against the other party should that party subsequently breach the contract." *Boston Scientific Corp. v. Mirowski Family Ventures, LLC*, 2012 WL 5996482, at *9 (S.D. Ind. Nov. 30, 2012) (quoting *Licocci v. Cardinal Assocs., Inc.* 492 N.E.2d 48, 52 (Ind. Ct. App. 1986)). "A material breach is one that goes to the heart of the contract." *New Berean Missionary Baptist Church, Inc. v. State Farm Fire & Cas. Ins. Co.*, 2010

WL 2010464, at *5 (S.D. Ind. May 18, 2010).[54] As Plaintiffs point out, the materiality of a

breach is a question of fact. *See Canada Dry Corp. v. Nehi Beverage Co., Inc. of Indianapolis,*

723 F.2d 512, 517 (7th Cir. 1983); *W. Am. Ins. Co. v. Cates,* 865 N.E.2d 1016, 1022 (Ind. Ct.

App. 2007).

The parties do not appear to dispute that Plaintiffs' attaching a copy of the Agreement in

an email was at least a technical breach of its confidentiality clause. We have already granted

Plaintiffs' motion for summary judgment on the counterclaim for breach of the confidentiality

clause on grounds that Defendants failed to demonstrate the existence of damages. *See supra,* §

IV(A). It does not necessarily follow, however, that the email was not a material breach. In

support of their argument for materiality, Defendants cite only one case, a Florida state court

decision. There, in *Gulliver Schools, Inc. v. Snay,* 137 So. 3d 1045 (Fla. Dist. Ct. App. 2014), a

teacher who settled his employment discrimination claims against his employer signed an

agreement that included a confidentiality clause; shortly thereafter, however, he discussed the

agreement with his college-age daughter (presumably not a law student), who proceeded to

broadcast that information to some 1200 of her Facebook friends. 137 So. 3d at 1046–1047.

When the teacher later brought a suit against the school for breach of the agreement, the court

ruled that his antecedent breach of the confidentiality clause foreclosed any recovery. *Id.* at 1048.

Although the court did not expressly discuss the question of materiality, it did state that the

confidentiality clause was "central" to the settlement agreement, and that "[t]he significance of

this provision is evidenced by the fact that [plaintiff's] entitlement to a significant sum of money

is expressly conditioned on his compliance with this provision." *Id.* at 1048 n.4.

---

[54] Defendants fault Plaintiffs for citing a list of factors relevant to materiality as enumerated in *Frazier v. Mellowitz,* 804 N.E.2d 796, 802–803 (Ind. Ct. App. 2004), noting that Indiana courts now look to a different formulation, as encapsulated in Restatement (Second) of Contracts § 241.

Plaintiffs, by contrast, argue that such a breach of the Agreement's confidentiality clause was not material because it did not go "to the heart of the contract." *Cf. Goff v. Graham,* 306 N.E.2d 758, 765 (Ind. Ct. App. 1974). The "heart" of the 2009 Settlement, they insist, was GSG and ATI's agreement to cease production and sale of the allegedly infringing GSG-5 in exchange for a sum of money and the "approval" of the GSG-522. Docket No. 346 at 69. In support of this notion, they point out that the language of the confidentiality clause itself suggests that the maintenance of secrecy about the existence of a deal was not of paramount importance. *See* Docket No. 45-1, ¶ 24. They also refer us to a Delaware decision that they view as analogous to our facts and as a useful counterpoint to the *Snay* decision leaned upon by Defendants. In *Texas Instruments, Inc. v. Qualcomm, Inc.*, 2004 WL 1631356 (Del. Ch. July 14, 2004), the Delaware court of chancery found that a party's breach of the confidentiality provision of a settlement agreement between two patent litigants was not material, because "peace" in the patent dispute, not confidentiality, was the agreement's central objective. "The [agreement] is not a confidentiality agreement. Nor was confidentiality identified by the parties as a critical term or goal of the [agreement]. The 'root of the agreement' or the 'essence of the contract' was patent peace between Qualcomm and [Texas Instruments]." 2004 WL 1631356, at *1.

We are not a court of chancery, and we do not enjoy a chancery court's freedom to decide summarily factual questions that are in genuine dispute. We believe that significantly more conclusive evidence of the centrality of the confidentiality clause would be necessary in order to take the question of materiality away from the jury. *See Canada Dry,* 723 F.2d at 517 ("We think that there was enough dispute as to these matters that the issues both of the occurrence of a breach and of its significance were properly left to the jury."). Defendants fail to meet their burden. While they present a slightly more extended discussion of the issue in their reply brief,

they offer only unsupported argument regarding the Restatement factors applied by the Indiana courts, particularly whether confidentiality was central to the "benefit of the bargain." *See Frazier v. Mellowitz,* 804 N.E.2d 796, 802–803 (Ind. Ct. App. 2004) (citing Restatement (Second) of Contracts § 241). For instance, they make the naked, conclusory assertion that "Defendants agreed to the settlement *only* because HKI agreed to keep it confidential." Docket No. 364 at 37 (emphasis added). This—and Defendants' other such assertions—may be true, and if they are, Plaintiffs' breach may have been material. But we are not in a position to say so. We therefore decline to declare as a matter of law that Plaintiffs' alleged prior material breach of the 2009 Agreement vitiates Plaintiffs' own contract claims.

Defendants' motion for summary judgment on Counterclaim Count X is accordingly DENIED. Because first material breach is the only argument Defendants present in support of their motion for summary judgment against Plaintiffs' own contract claims (Amended Complaint Counts I and II), Defendants' motion for summary judgment on Plaintiffs' Counts I and II is also DENIED.

## Conclusion

We have resolved the pending motions as follows. Defendants' motion to strike Plaintiffs' affirmative defenses to counterclaims [Docket No. 282] is DENIED as moot, as detailed above.

Plaintiffs' motion for summary judgment [Docket No. 329] is GRANTED with respect to Counterclaim Counts I, III, IV, VI, VII, VIII, and IX. The motion is GRANTED as to Counterclaim Count V with respect to paragraph 14 of the Agreement and DENIED with respect to paragraph 5 of the Agreement, as detailed above.

Defendants' motion for summary judgment [Docket No. 331] is DENIED with respect to Counterclaim Counts I, III, IV, V, VI, VII, VIII, IX, X, XI and XII and with respect to Counts I, II, V, VI, VII, and IX of Plaintiffs' Amended Complaint.

IT IS SO ORDERED.

Date: _____ December 24, 2014 _____

_____

SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

94

Distribution:


Darlene R. Seymour
dseymour@ce-ip.com

Jason M. Sneed
SNEED PLLC
jsneed@sneedlegal.com

Charles .M. Landrum, III
SNEED PLLC
clandrum@sneedlegal.com

Bruce Benjamin Paul
STITES & HARBISON, LLP
bpaul@stites.com

Douglas B. Bates
STITES & HARBISON, LLP
dbates@stites.com

Neal F. Bailen
STITES & HARBISON, LLP
nbailen@stites.com

Anne L. Cowgur
TAFT STETTINIUS & HOLLISTER LLP
acowgur@taftlaw.com

Jonathan G. Polak
TAFT STETTINIUS & HOLLISTER LLP
jpolak@taftlaw.com

Michael Zachary Gordon
TAFT STETTINIUS & HOLLISTER LLP
zgordon@taftlaw.com

Peter Jon Prettyman
TAFT STETTINIUS & HOLLISTER LLP
pprettyman@taftlaw.com

Tracy Nicole Betz
TAFT STETTINIUS & HOLLISTER LLP
tbetz@taftlaw.com